**Michael Alan CROOKER, Plaintiff,**

v.

**Peter VAN HIGGINS, John Meara, Thomas Mulligan, Ruben Borrero and Alvin Correira, Defendants.**

Civ. A. No. 85–0133–F.

United States District Court,
D. Massachusetts.

April 4, 1988.

---

Michael Alan Crooker, pro se.

John M. Thompson, Stephen Ferrarone, Springfield, Mass., for plaintiff.

Timothy M. Burke, Mark Newman, Boston, Mass., for Higgins.

Edward M. Pikula, Asst. City Sol., Law Dept., Springfield, Mass., for Meara, Mulligan, Borrero and Correira.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Plaintiff Michael Crooker filed this 42 U.S.C. § 1983 action against the above-named police officers alleging various constitutional violations resulting from a search of Crooker's apartment. A review of the procedural posture of the case is necessary for an understanding of the Court's discussion.

### II. PROCEDURAL HISTORY

On July 16, 1984 police officers performed a search of plaintiff's residence. Thereafter, Mr. Crooker—by that time a prisoner in Springfield, Massachusetts—filed six separate pro se complaints against the officers involved in the search. On March 4, 1986 a United States Magistrate dismissed five of the cases upon consent of the parties and allowed plaintiff to file an amended complaint consolidating all of his claims against all of the defendants. The thirteen count amended complaint was docketed on March 4, 1986 and named as defendants four Springfield, Massachusetts police officers and one Massachusetts state trooper. The Magistrate on that day also allowed plaintiff's motion for court-appointed counsel pursuant to 28 U.S.C. § 1915(d). Appointed counsel requested leave to file another amended complaint, which was denied by the Magistrate on January 27, 1988. The March 4, 1986 complaint is thus the operative pleading and central to the discussion which follows below.

Defendants filed motions to dismiss and for summary judgment. These matters were referred to a United States Magistrate. After receiving the Magistrate's Report and Recommendation and making a de novo review of the parties' objections thereto, this Court on May 27, 1987 issued a Memorandum and Order entirely dismissing from the complaint counts 1, 9, 10 and 12 and partially dismissing count 7. Defendants' motions were denied on the remaining counts.

Later, plaintiff moved for summary judgment with respect to counts 1, 2, 3, 4, 5, 11 and 13. This motion, too, was referred to the Magistrate. In his Report dated October 19, 1987 the Magistrate recommended that this Court enter summary judgment in favor of plaintiff on counts 2, 3, 4 and 5 and deny plaintiff summary judgment on counts 11 and 13. Count 1 had already been dismissed. Now before the Court are defendants' objections to the Magistrate's October 19, 1987 Report.

### III. FACTS

Unlike the situation in most cases, there have been objections made to the

Magistrate's findings of fact. Accordingly, the Court has made an independent review of the record and reached its own conclusions with respect to the facts. The following facts differ from those found by the Magistrate because .the Court finds the Magistrate failed to report the facts in the light most favorable to the defendants as required by summary judgment law. *See United States Fire Insurance Company v. Producciones Padosa, Inc.*, 835 F.2d 950, 953 (1st Cir.1987) (facts must be reviewed in light most flattering to non-movant in Rule 56 cases). As the Magistrate wrote in his Report, his facts were derived substantially from his April 15, 1987 Report and Recommendation. That matter, however, was before the Magistrate on *defendants'* motions, requiring the Magistrate to examine the facts in the posture most accommodating to plaintiff. The present motion involves *plaintiff's* bid for summary judgment, requiring the Court to narrate the version of the facts giving rise to the litigation in the light most favorable to the defendants. As a result, the Court's reports of the factual accounts in these two situations vastly differs in certain areas. Yet, this result is necessary where there are cross motions for summary judgment and conflicting evidence in the record. *Id.* [1]

Defendant Higgins is a Massachusetts State Trooper assigned to the Hampden County District Attorney's Office as a member of the Crime Prevention and Control Unit. The other defendants are all Springfield Police Department detectives. Defendant Meara is assigned to the Larceny Fraud Squad, defendants Correira and Borrero are part of the Housebreak Squad and defendant Mulligan is an Arson Squad detective.

There is no dispute that in February and March of 1984 Meara received and began investigating complaints from local stores and banks concerning fraud by check and credit card. Meara's investigation of specific names involved led to him to a post office box rented to plaintiff Michael Crooker. In March and April of 1984, Higgins was conducting an entirely separate investigation into a credit card scheme being used at area stores, and Crooker's name surfaced. Upon checking with the Springfield Police Department, Higgins learned about Meara's investigation. During the summer of 1984, Higgins and Meara kept one another up-to-date on their respective investigations. When · he checked into Crooker's background, Higgins was informed, and he concluded, that Crooker should be considered dangerous.

Shortly after receiving a letter on July 9, 1984 from Edward Sepanek, a prisoner at the Hampden County House of Correction, Higgins interviewed him. During the interview, Sepanek told Higgins the following: 1) Crooker and his wife Lorraine lived at 114 Central Street, Springfield, Massachusetts; 2) Sepanek had been involved in a credit card scheme with Crooker; 3) Crooker had shown Sepanek blank birth certificates, marriage licenses, and identification cards; 4) Crooker had shown Sepanek a collection of guns, including an AR–15 Colt semiautomatic rifle which he had converted to a fully automatic weapon; 5) Crooker had a large supply of chemicals in his apartment, most of which were kept in a cabinet over the kitchen sink, including a

---

**1.** In all fairness to the Magistrate, defendants failed to bring forth specific facts in their favor to the Magistrate's attention, most likely in violation of Fed.R.Civ.P. 56(e) and Local Rule 18, which require the non-moving party to set forth specific facts showing there is a genuine issue for trial. Defendants rely on bald and general denials in the materials they filed with the Magistrate. The Court notes that this is not the first time counsel for the City of Springfield has shirked his Rule 56 responsibilities. If the City Solicitor maintains such a practice in the future before the Magistrate or this Court, I will exercise my discretion and grant summary judgment against his clients as a matter of course.

In the final analysis, though, the Magistrate had all of the evidence in defendants' favor before him when he rendered his decision, including the transcript of a criminal suppression hearing in state court. This Court's findings of fact are heavily drawn from that transcript as well as the state court judge's conclusions therefrom. Many of the defendants' statements in this hearing are in direct contrast to plaintiff's allegations which the Magistrate relied upon in forming his factual findings. References to the suppression hearing transcript are by volume and page (e.g., H1, 1).

clay-like substance kept immersed in kerosene which Crooker said was highly explosive; 6) Crooker kept extensive records of transactions and false credit cards in a filing cabinet in the bedroom; and 7) Crooker had bragged about a safe deposit box in which he kept cash and false identification cards.

On Sunday, July 15, 1984 at approximately 11:45 p.m., Crooker telephoned the Springfield Police Department and reported that a burglary had occurred at his residence at 114 Central Street in Springfield and that numerous firearms had been stolen. Police officers arrived, investigated and departed that evening. On Monday, July 16, Officers Correira and Borrero of the Springfield Police Department's Housebreak Squad were assigned to the case. Around 8:30 a.m. that day, Borrero telephoned Crooker and after receiving some information regarding stolen items, he arranged to drop off an insurance form at Crooker's residence later that afternoon. After waiting for the police to arrive with the form for one half hour, Crooker departed and left a note requesting that the officers slide the form under the door during his absence. Borrero and Correira arrived and knocked on Crooker's door but got no answer and decided to return later rather than leave the form at Crooker's residence.

When Crooker returned, his wife told him there had been loud knocking earlier. Assuming it had been the police attempting to deliver the insurance form, he telephoned the Springfield Police Department and spoke with Meara, who said he would try and get in touch with the detectives assigned to the case. Meara ran a records check and discovered there was an outstanding arrest warrant for Crooker from the Welfare Department involving larceny over $100.00. Meara then contacted Higgins, who came to police headquarters. Correira and Borrero were also contacted and told to report to the station, at which time they were informed by Meara and Higgins that the latter two were conducting separate investigations which involved Crooker and that he should be considered dangerous. Correira and Borrero were

also told of the outstanding arrest warrant for Crooker.

During the meeting attended by Meara, Higgins, Correira and Borrero, it was agreed that Higgins would accompany Correira and Borrero on a visit to Crooker's residence, ostensibly as part of the investigation of the reported burglary, but in fact to observe the apartment which Sepanek had earlier described to Higgins and to eventually arrest Crooker on the outstanding warrant. As part of the plan, the officers agreed they would arrest Crooker after completing the burglary investigation upon a signal from Higgins. Higgins would not be identified as a state trooper but as Borrero and Correira's supervisor, to prevent Crooker from becoming suspicious. Higgins told Correira and Borrero he had reason to believe that Crooker's apartment contained hazardous explosives and that he believed Crooker was a very dangerous man. He also told them of the information he had received from Sepanek and others that Crooker possessed in his apartment a certain chemical that was lethal upon contact and that Crooker had threatened to shoot a police officer with a machine gun.

When Higgins, Correira and Borrero arrived at Crooker's residence at approximately 11:00 a.m. on July 16, 1984, they possessed a valid arrest warrant but no search warrant. The officers proceeded to Crooker's apartment and knocked on his door. Crooker opened the door and found three officers, having expected to see only one with the insurance form. Correira told Crooker the officers were there to investigate his reported burglary. In response to Crooker's inquiry, Correira falsely identified Higgins as his supervisor, stating he was there to observe. This identification apparently occurred simultaneously with entry into the apartment. Higgins later testified that he was, in fact, not there to investigate a burglary but to examine the apartment as Sepanek had described it to him and to arrest Crooker.

The Springfield officers claim that upon entering the apartment, they began investigating the burglary with Crooker in pur-

suit asking the officers what they were doing. Although the exact sequence of the series of actions which followed is not clear, Correira apparently inquired about the burglar's point of entry and Crooker pointed to a living room window. Correira asked where the stolen firearms had been stored and Crooker led him to the bedroom and pointed to an open closet with a red tool box sitting on the floor. Higgins either asked or requested Crooker to open the box. Crooker objected, stating nothing had been taken from the box. Higgins told or again asked him to open it, and Crooker did so. When Crooker opened the box, only the top tray was exposed. Higgins then lifted the top tray, looked underneath and discovered, among other items, three grenades.

Crooker mentioned that one firearm, a revolver, had not been stolen because it was hidden in a case under a bedroom dresser. The police wanted to see the gun. Crooker responded by saying: "For what? ... It wasn't taken, I've checked." Nevertheless, Correira told Crooker to open the box stating the officers would still have to see the revolver. Crooker then retrieved the key, unlocked the case, removed the revolver and handed it to Correira stating, "be careful, it's loaded." Correira returned the gun to Crooker and instructed him to lock it up again. When asked for any permits to possess firearms, Crooker gave the officers Lorraine Crooker's firearm identification card, which had been pinned to a bedroom bulletin board and which the officers acknowledged was valid.

Based on the information he received from Sepanek, Higgins went into the kitchen and opened a closet cabinet which contained various chemicals, including the clay-like substance immersed in kerosene. When asked what the substance was, Crooker came into the kitchen and objected to Higgins' search of the kitchen. The substance was later determined to be metallic sulphur which, when mixed with water, becomes sulphur dioxide. Sulphur dioxide forms hydrogen, which is highly flammable and can cause explosions. Various chemicals were found out in the open in other parts of the kitchen. Many of these chemicals are also used to make explosives.

Higgins then signalled the other officers who placed Crooker under arrest and displayed a copy of the arrest warrant. None of the three officers read *Miranda* rights after the arrest, which was effected anywhere from twenty to sixty minutes after entering the apartment. After his arrest, one officer asked Crooker for his car keys, but Crooker refused to cooperate. Crooker falsely told the officer that the vehicle parked in front of his residence was not his. The vehicle was towed to the police station where it was later searched pursuant to a warrant.

Mulligan of the Arson Squad was summonsed to the apartment. He arrived around noon and Higgins told him to evaluate what he saw and keep the apartment secured until he received further instructions. Mulligan was asked to observe the ammunition and a flare-type rocket in the bedroom and the chemicals in the kitchen. Mulligan concluded Crooker was involved in operating a small bomb operation and that many of the items in the apartment posed a potential danger to human life. Shortly after Mulligan's arrival, Crooker was transported to Springfield Police Headquarters. Mulligan remained in the apartment with Crooker's wife until police officers returned with a search warrant between 8:00 and 9:00 p.m. Crooker's wife was not allowed to touch anything within the apartment while the search warrant was being obtained.

When Crooker was brought to the police station, he was booked. Meara did not conduct the booking himself but he observed the process. Crooker was asked to take everything out of his pockets and to also empty whatever he had in his wallet on the booking desk, which he did. Meara then examined the paperwork Crooker had emptied on the desk and picked up the wallet to see if there was any evidence to help him in his investigation of Crooker for fraud. Meara felt something stiff in the wallet and from behind a piece of leather, he removed a Connecticut driver's license in the name of Michael Crooker with a

Granby, Connecticut address and what he recognized to be a safe deposit box key. Among the items already emptied on the desk was a duplicate Massachusetts driver's license in the name of Michael Crooker. Meara also seized a set of car and house keys.

Higgins made application for a search warrant for Crooker's residence at 114 Central Street between 12:30 and 1:00 p.m. on July 16, 1984. A search warrant was issued the same day by Magistrate Frank M. Doyle of Springfield District Court. The warrant authorized a search of the apartment, including the two-drawer metal file cabinet in the bedroom, in addition to Crooker's automobile for the following property:

Any and all firearms, rifles, shotguns, dangerous weapons, explosive devices or chemical substances or components or information necessary to the production of such devices, false, fraudulent or stolen means of identification, false, fraudulent or stolen checks, false, fraudulent or stolen credit cards, or any items, papers or effects that are pertinent to, give evidence of, or exhibit information relating to the above.

Exhibit ("Ex.") C to Defendants' Motion for Summary Judgment. The police returned to Crooker's apartment to execute the search warrant sometime between 6:30 and 9:00 p.m.

In addition to the chemicals which were stored in the kitchen cabinet, the police found and seized other chemicals which were stored in a hallway closet. They seized the tool box in the bedroom closet and the contents thereof. In a bureau in the bedroom, they found and seized three World War II–type hand grenades, two safe deposit box keys—one of which matched the key which had been found in Crooker's wallet—and a hypodermic needle and syringe. They found and seized numerous books and pamphlets dealing with weapons, explosives and various types of covert and illegal activity. They also seized the filing cabinet that was in the bedroom and all the contents thereof. They seized, in total, 199 items of personal property, many of which have no apparent connection with any criminal activity.

While the search of the apartment was in progress, the caretaker of the building arrived with a United Parcel Service package addressed to Crooker which had been left with a neighbor in another apartment. The package was marked "hazardous." The police opened the package and found that it contained aluminum powder and explosive devices. The contents of the package were also seized pursuant to the warrant. The search of the apartment was completed at about 8:00 p.m. Lorraine Crooker was placed under arrest at that time and transported to the police station.

The yellow Pontiac LeMans coupe was searched at the police station garage. Its registration in the name of Charles M. Jefferson—a known alias of Crooker—of 114 Central Street was found and seized. Also found in the car was a flare gun with five rounds of ammunition and two gasoline credit cards in the name of Michael A. Robinson.

On the following day, July 17, 1984, the police obtained warrants from the District Court of Springfield to search the two safe deposit boxes, the keys of which had been found on the bedroom bureau. In one of those boxes, they found $3,700 in United States currency, passports in the names of Michael Alan Crooker and Lorraine Crooker, several forms of identification, and checkbooks in various names.

After the searches and seizures, Crooker filed this action under 42 U.S.C. § 1983 against defendants Higgins, Meara, Mulligan, Borrero and Correira. The counts surviving the first round of summary judgment charge defendants with entering plaintiff's apartment and conducting unlawful searches and seizures without a warrant, making misrepresentations in applying for warrants, and conducting a pretextual inventory search after arresting him, all in violation of Crooker's constitutional rights.

## IV. OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION

Based on his findings of fact, the Magistrate recommended that summary judg-

ment be granted in favor of Crooker on counts 2, 3, 4 and 5, and denied on counts 11 and 13. Defendants filed timely objections to the Magistrate's Report. Before considering the substantive objections, though, a procedural matter must be discussed.

In his opposition to defendants' objections to the Magistrate's Report, plaintiff argues that the defendants failed to raise the arguments they now assert before this Court and thus have waived their right to a de novo review of those arguments.

As mentioned above, it is true that defendants' written materials in opposing plaintiff's motion for summary judgment before the Magistrate were seriously deficient. Higgins' opposition stated merely that plaintiff's motion for summary judgment was not directed at him—which is an argument this Court finds indefensible. The other defendants presented legal defenses of consent and qualified immunity, yet for some unknown reason failed to accompany those defenses with legal arguments. These failures are particularly troubling in a case like this where the burden of production on some of the defenses is on the defendants. The Magistrate thus had little material from the defendants in considering plaintiff's motion for summary judgment. He ruled, in part, against defendants who now have filed objections containing more specific legal arguments with references to the record.

The First Circuit has recently issued two opinions stating unequivocally that district court judges on a de novo review of a magistrate's report and recommendation may entirely ignore arguments not presented to the magistrate. *See Paterson-Leitch Company v. Massachusetts Municipal Wholesale Electrical Company*, 840 F.2d 985, 989–991 (1st Cir.1988); *Borden v. Secretary of Health and Human Services*, 836 F.2d 4, 6 (1st Cir.1987). These decisions are important to district court judges referring matters to magistrates in order to reduce the Court's workload.

■ However, while district courts have the option to ignore arguments not made before the magistrate regarding dispositive motions, they are not required to do so. It has long been established that district courts are free to attach whatever weight they wish to the magistrate's report and recommendation due to the advisory nature of his role relating to dispositive motions. *See United States v. Raddatz*, 447 U.S. 667, 683–84, 100 S.Ct. 2406, 2416–17, 65 L.Ed.2d 424 (1980); *Mathews v. Webber*, 423 U.S. 261, 270–71, 96 S.Ct. 549, 554–55, 46 L.Ed.2d 483 (1976). In the present case, even though defendants failed miserably in attempting to meet their obligations under both summary judgment and procedural rules, this Court will nevertheless entertain some of the arguments they never raised below. This decision is based on two considerations. First, although the Court's power to disregard first-time arguments has long been assumed, it is only recently that the principle has been expressly recognized by the First Circuit. The *Borden* and *Paterson* decisions were released in December 1987 and February 1988 respectively. The litigation now before the Court preceded these decisions. Second, and more importantly, the Court is reluctant to impose such a severe sanction on a party for its attorney's neglect, absent knowledge that the attorney had fair warning.

■ With these concerns in mind, the Court hereby suggests that magistrates, receiving referrals from this Judge, give the two following warnings on the record to litigants appearing before them on dispositive pre-trial motions. First, although they have a statutory right to de novo review by the district court, such consideration will be strictly limited to a review of those legal arguments and issues made before the magistrate absent compelling circumstances warranting otherwise. That is, the district court will ordinarily refuse to consider on de novo review arguments which could have been, but were not, presented to the magistrate in the first instance. *See Paterson*, at 989–991; *Borden*, 836 F.2d at 6. It is suggested that this warning be given to parties before they make their arguments before the magistrate. Second, to receive de novo review of arguments or issues raised be-

fore a magistrate, a party's written objections to the magistrate's report and recommendation must be specific, concise and supported by legal arguments and citations to the record. Broad, yet unsupported objections will not be permitted and failure to make specific and documented objections may foreclose de novo review.

With these types of admonitions given to litigants before the Magistrate, this Court will be able to routinely apply the *Paterson* and *Borden* rules by refusing to consider arguments or issues raised for the first time in objections to a magistrate's report and recommendation.

## V. DISCUSSION

The Court now turns to the specific objections raised by defendants. The following discussion will analyze defendants' objections as they pertain to each count.

### A. Count Two

■ In this count, plaintiff alleges defendants Higgins, Borrero and Correira violated his civil rights by unlawfully searching the metal strongbox under his bed after compelling him to open the box. This strongbox contained a revolver which was later seized by the police pursuant to a search warrant.

In his Report, the Magistrate recommends that summary judgment be granted in favor of plaintiff on this count. In so doing, the Magistrate found no support for defendants' position that Crooker consented to the search. In their objections, defendants maintain that summary judgment is inappropriate because there exists a genuine question of fact for a jury regarding whether Crooker consented to the search. They assert further that they are entitled to qualified immunity.

The Supreme Court has recently articulated that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, 215 (1986). Accordingly, the substantive legal standard

governing consent to searches needs to be identified.

First, so there can be no doubt, a warrantless search authorized by consent is constitutionally permissible. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The consent, however, must be voluntarily given and voluntariness is a question of fact to be determined from the totality of the circumstances, but is an issue upon which the defendants ultimately have the burden of proof. *See Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968). Thus, the focus of the inquiry is whether, under the unique factors and circumstances of the present case, Crooker consented to the search of the strongbox. *Schneckloth*, 412 U.S. at 229, 233, 234, 248, 93 S.Ct. at 2048–49, 2050–51, 2051, 2058–59. This analysis requires an examination of the record, but because this matter is before the Court on plaintiff's summary judgment motion, the facts must be accepted in the manner most favorable to the defendants.

As mentioned, there was a lengthy criminal suppression hearing in state court. Considering defendants' testimony in the light most favorable to them, the record is as follows with respect to count two. Trooper Higgins testified under oath that he asked Crooker to examine the contents of the strongbox to see if any ammunition was stolen during the burglary. Crooker opened the locked box and produced a pistol. H2, 57. Defense counsel later asked Higgins:

Q. Did you ask Mr. Crooker to open this box?

A. Yes, I did, sir.

Q. Did you tell Mr. Crooker to open the box?

A. No, sir.

Q. Did you ask him what was inside the box?

A. No, sir.

Q. Did any of the officers ask him what was inside the box?

A. No, sir.

H3, 97.

Springfield detective Correira testified next. With respect to the opening of the strongbox containing the handgun, he stated:

Q. Did you tell him to open it?

A. I may have, to determine if the gun was still inside it.

Q. He had already told you there was nothing in there, didn't he? What did he tell you?

A. I don't recall, but I recall telling him to open it up to determine if the gun was still inside.

Q. When you are doing investigations of housebreaks, your job isn't to look for things that are still in the house, the idea is to determine what has been taken, so if Mr. Crooker, for example, said to you, yah, I have a gun in here, but it wasn't taken, would it be your responsibility to look for that gun?

A. Yes.

Q. Why?

A. I would run that gun's serial numbers.

Q. If it's still in the house and it hasn't been taken?

A. Absolutely.

H4, 30–31.

Q. Did he tell you about anymore, once you got to the apartment?

A. Yes, he did. He indicated to us at that time, Rubin and the trooper who were with me, that there was in fact a handgun in the room in a case. At that time, I don't know if I asked singly or the trooper and I asked together, to open the case and determine if that gun was in fact still in the case.

Q. What happened?

A. The case was opened and the gun was shown to be still inside.

H4, 14.

Finally, Detective Borrero similarly testified:

Q. Did he point out a closet area to you?

A. Yes, he did.

Q. Where was that?

A. That was in the bedroom.

Q. Do you recall how that came about that he showed you the closet?

A. Yes, he told us that that is where the guns were kept.

Q. Any other areas that he pointed out to you or any other objects?

A. He also stated that there was a—he had a gun that was not taken that he had in the strongbox.

Q. What happened in regard to the strongbox?

A. At that time, we asked him to show us the gun and he produced a gun, a revolver.

Q. How was that produced?

A. He started opening it up, and at that time we took it from him and observed the gun and replaced it back.

H4, 52–53.

Q. Did somebody tell him to open that box?

A. I believe Trooper Higgins asked him to open up the box, yes.

Q. He asked him or he told him?

A. No, he asked him.

H4, 56.

In opposition to the above-quoted testimony, Crooker testified that he was ordered, in no uncertain terms, to open the box.

Based on this evidence, the Court disagrees with the Magistrate's conclusion that there is no genuine issue of material fact as to whether Crooker consented to the search. If this testimony is believed by a jury, the search was lawful. Moreover, *Bustamonte* instructs that the court must examine the particular circumstances of the case, including the individual's state of mind. Mr. Crooker cannot be said to be ignorant of his legal rights, especially those having to do with police officers. The present complaint is the forty-eighth case he has filed in this Court within the last decade. He has appeared pro se in

many, some of which were civil rights cases in which he was the victor. While, of course, this fact is not dispositive on the issue of consent, *Bustamonte* allows the Court to consider factors such as an individual's subjective knowledge in examining consent in a given situation. Mr. Crooker is well versed on individual rights.

Also, there is no indicia of the traditional circumstances calling the voluntariness of a consent into question in this case. Plaintiff makes no claims, and there is no evidence, suggesting that any of the police officers threatened, force or coerced him during the search. *Cf. United States v. Ciovacco*, 518 F.2d 29, 30 (1st Cir.1975).

Considering the totality of the circumstances, there is conflicting evidence with respect to consent. Based on the testimony during the suppression hearing, as well as statements made in affidavits, there is ample evidence creating a jury question regarding whether Crooker consented to the search at issue and, if so, whether such consent was voluntary. Plaintiff's motion for summary judgment on this count is denied against all defendants.

### B. Count Three

■ This count charges defendants Higgins, Borrero and Correira with unlawfully opening and searching a large red tool box found in an open closet in violation of plaintiff's constitutional rights. This box contained grenades and ammunition later lawfully seized by the police.

The Magistrate once again recommended that summary judgment be granted for plaintiff, rejecting defendants' claim that Crooker consented to this search as well. The Magistrate wrote "Crooker was ordered by Higgins, who accompanied Borrero and Correira, to open the box." Report and Recommendation at 18. Upon a full review of the record, the Court will reject the Magistrate's recommendation on this count.

Similar to the previous count, there is ample evidence warranting a trial on count three. During the suppression hearing, Trooper Higgins testified with respect to count three as follows:

A. ... There was then some discussion about where the guns were stolen from, and Lorraine started talking in the bedroom and Michael went into the bedroom, and then, once inside the bedroom, he pointed out that the guns were kept in a closet, a bedroom closet, and there was like a metal tool chest, red tool chest, like a Sears Craftsman tool chest, and Michael said he kept all his ammunition in there and that none of that was stolen. I asked him to check, and he said he didn't understand why we were that concerned about any of that, that all we had to do was take the report and leave. Then he opened the tool chest and said, "Nothing was taken out of here. All you should be interested in is the guns and let's get out of here, you shouldn't be going around my house."

H2, 56.

Q. Did you ask Mr. Crooker to open the red box?

A. Yes, sir.

Q. Did you order him to open the box?

A. No, sir.

H3, 98.

Correira testified:

Q. You mentioned that you were interested in finding out whether anything else had been taken, is that correct?

A. Yes,

Q. And how did you plan to do that?

A. I asked him if ammunition had been taken besides what he was aware of.

Q. And what was his answer to that?

A. He didn't think so. He said no.

Q. So, in your presence and the presence of the two other officers, your testimony is that he volunteered to open this box, is that correct?

A. No, he did not volunteer. I asked him to open it, to do the inventory.

H4, 29–30.

Finally, Borrero testified:

Q. Did somebody tell him to open that box?

A. I believe Trooper Higgins asked him to open up the box, yes.

Q. He asked him or he told him?

A. No, he asked him.

H4, 56.

The Magistrate wrote that there is no evidence in the record indicating plaintiff may have consented to the search. This Court, however, believes the above-quoted testimony proves otherwise and creates a jury question. Plaintiff's motion for summary judgment against all defendants on count three is denied.

### C. Count Four

This count charges defendants Higgins, Borrero and Correira with violating plaintiff's constitutional rights by unlawfully searching the kitchen cabinet in his apartment. In this cabinet police officers found various chemicals used to make explosives, as well as a quantity of metallic sulphur submersed in kerosene, thus corroborating Sepanek's statement to Higgins that Crooker possessed an extremely lethal chemical in his kitchen.

Defendants Borrero and Correira defended this count by arguing they did not personally partake in the opening of the cabinet and seized the metallic sulphur and chemicals only after they came into the kitchen and saw these substances in plain view. Defendant Higgins' defense below was that he was entitled to eleventh amendment sovereign immunity as a state official. By all accounts, Higgins entered the kitchen and opened the closed cabinet where some of the chemicals were found, see H2, 55; H3, 85, 114 and 120–21; H4, 53, although there is evidence that Officers

Borrero and Correira were elsewhere in the apartment when Higgins opened the cabinet. H4, 117.

The Magistrate recommended that summary judgment be granted in favor of Crooker on this count against defendants Borrero, Correira and Higgins. The Magistrate rejected Borrero and Correira's plain view defense, reasoning that the chemicals were in plain view only after Higgins opened the cabinet. He further found that Higgins was not entitled to eleventh amendment sovereign immunity protection. Defendants object to the Magistrate's recommendation on this count. Defendant Higgins for the first time asserts that the warrantless search of the kitchen cabinet was proper due to exigent circumstances. Borrero and Correira reassert their plain view defense.

 Higgins never pleaded, raised or argued his exigent circumstances defense before the Magistrate. Higgins has never filed an answer and has had ample time in which to raise the defense. It is only now, after having lost below, that Higgins now attempts to assert this new defense. Because Higgins failed to plead, raise or argue his exigent circumstances defense before the Magistrate, this Court will now refuse to entertain it at this late stage.[2] Because all of the evidence in the record indicates that Trooper Higgins unreasonably opened the kitchen cabinet without a warrant, summary judgment is appropriate against him on this count.

 While granting plaintiff's summary judgment motion against defendant Higgins is appropriate, it does not automatically follow that defendants Borrero and Correira are guilty as well. That is, although it is true that the items in the kitchen

**2.** The reasons why the Court is permitting the defendants to present new arguments in counts two and three not made before the Magistrate must be distinguished from this situation. In counts two and three, the defendants raised the issue of consent before the Magistrate, although they failed to sufficiently elaborate on the grounds why they should prevail on the defense. The Magistrate, therefore, was at least on notice that the defendants sought to have him consider their consent defense and had all the facts in

support of the defense before him when he made his Report and Recommendation. With respect to count four, however, defendant Higgins never even raised the exigent circumstances defense. The Magistrate was thus never even aware that exigency was an issue when he made his ruling against Higgins.

This is a distinction with a difference and is the reason why Higgins' exigent circumstances defense will not now be heard.

cabinet did not come into plain view until after Higgins opened it, it does not necessarily follow that Borrero and Correira are responsible for Higgins' wrongdoing. There is conflicting evidence regarding Borrero and Correira's culpability for the cabinet opening incident. H4, 117. It is for a jury to decide whether Borrero and Correira somehow participated in the unlawful search of the cabinet—actively, or passively but with knowledge—or whether they innocently came into the kitchen after Higgins opened the cabinet and observed the explosives in plain view which, if the jury believes, would absolve them of fourth amendment liability.

Accordingly, the Magistrate's recommendation on this case is partially adopted. Plaintiff's motion for summary judgment is granted on count four against defendant Higgins, but denied against defendants Borrero and Correira.

### D. Count Five

 This count charges defendants Higgins, Borrero, Correira and Meara with unlawfully seizing certain items found in Crooker's apartment prior to obtaining a search warrant for the apartment. In recommending that this Court grant summary judgment for plaintiff on this count, the Magistrate wrote:

> [P]laintiff alleges that after he was arrested and his residence was secured, but prior to a search warrant being secured, his bedroom dresser drawers were searched ... and some chemicals were removed from the apartment ... [and] if those allegations are not disputed as required by Rule 56, then no material, genuine issue remains and the only conclusion is that the seizure and continued

searching of plaintiff's premises was improper.

Report and Recommendation at 21. In their objections to the Magistrate's Report, defendants argue there is sufficient evidence challenging plaintiff's allegations that items were seized before a warrant was obtained and that, therefore, summary judgment is inappropriate.

The Court will reject the Magistrate's recommendation on this count. While defendants once again, without any apparent reason, fail in their memorandum and opposition to plaintiff's summary judgment motion to document and specifically cite to evidence in their favor, that evidence was before the Magistrate when he made his ruling. Contained in the transcript of the state suppression hearing are specific affirmations made under oath by Trooper Higgins, H3, 100, and Officer Mulligan, H3, 159 and 162, that nothing was seized until a search warrant was obtained after the initial search. This evidence, specifically refuting Crooker's claims, creates a genuine issue of material fact for trial.[3] The Court rejects the Magistrate's recommendation and denies plaintiff's motion for summary judgment on count five.

### E. Counts Eleven and Thirteen

The Magistrate recommended that plaintiff's motion for summary judgment be denied with respect to these counts. Inasmuch as plaintiff has not objected to these decisions, the Court adopts the Magistrate's recommendation and denies plaintiff's motion for summary judgment on counts eleven and thirteen.

---

**3.** The Court appreciates the Magistrate's position. He was faced with defendants' blanket claim that "the question of whether Officer Mulligan illegally searched and seized while the officers were obtaining a search warrant would appear to be a question of material fact precluding summary judgment." Defendants' Opposition to Motion for Summary Judgment at 2. This argument, lacking citations to the record, falls far short of the Rule 56 burden as well as the Court's Local Rules. Local Rule 18, extrapolating on Rule 56, states: "Oppositions to motions for summary judgment shall include a concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." This rule applies with equal force to litigants before the Magistrate.

However, granting summary judgment in favor of plaintiff based on defense counsel's failure to adhere to clearly-established rules before the Magistrate is not, in the eyes of the Court, in the best interest of justice in this case. As mentioned above, however, failure to obey these rules after an express warning by the Magistrate in the future will jeopardize de novo review.

## VI. CONCLUSION

The Court REJECTS the Magistrate's recommendation and DENIES plaintiff's motion for summary judgment on counts two, three, and five. The Court ADOPTS the Magistrate's recommendation and also DENIES plaintiff's motion for summary judgment on counts eleven and thirteen. Finally, the Court partially ADOPTS the Magistrate's recommendation and GRANTS plaintiff's motion for summary judgment on count four against defendant Higgins but DENIES such motion against defendants Borrero and Correira on this count.

It is So Ordered.