724 F.Supp. 1052 (1989)
UNITED STATES of America
v.
Robert ZYGAROWSKI, Defendant.
Crim. No. 88-0224-F.
United States District Court, D. Massachusetts.
October 16, 1989.
On Motion for Reconsideration October 27, 1989.
Susan Via, Asst. U.S. Atty., U.S. Attys. Office, Boston, Mass., for U.S.
Daniel Kelly, Springfield, Mass., for defendant.

*1053 MEMORANDUM AND ORDER
FREEDMAN, Chief Justice.

I. INTRODUCTION
Before the Court are defendant Robert Zygarowski's ("Zygarowski") two separate objections to a Report and Recommendation by United States Magistrate Michael A. Ponsor ("Magistrate's Report") that the defendant's motions for specific performance by the government and for suppression of evidence be denied. The United States has responded to Zygarowski's objections, and urges this Court to affirm the Magistrate's recommendation.

II. BACKGROUND
The defendant Zygarowski was indicted on August 4, 1988 under 18 U.S.C. § 2252(a)(2)[1] for knowingly receiving visual depictions, the production of which involved the use of minors engaging in sexually explicit conduct.[2] Specifically, the United States alleges that the defendant sent away for and received a VHS video-cassette entitled "Pre-Teen Trio," containing scenes of persons under the age of 18 engaged in conduct covered by the statute.
With the agreement of the parties, Magistrate Ponsor waived the usual evidentiary hearing with respect to the motion for specific performance, and assessed the defendant's claim on the basis of the defendant's version of the facts. Magistrate Ponsor specifically noted, however, that the facts were disputed in several material respects. Upon review of Zygarowski's objections to the Magistrate's Report and the government's response thereto, the Court concluded that a factual hearing was necessary to resolve the dispute between the parties. A two hour hearing was held on October 18, 1989, at which both Daniel Kelly, the defendant's attorney, and Susan Via, the Assistant United States Attorney in charge of this case, were themselves represented by counsel. Accordingly, the Court's discussion of that motion will be based on the facts as it found them at that hearing. With respect to the motion to suppress, however, the Court is aided by the fact that Magistrate Ponsor heard five days of testimony from a variety of witnesses.
Having reviewed the facts as found by this Court and the Magistrate, and having weighed the legal arguments, the Court concludes in both instances that the Report and Recommendation of the Magistrate should be adopted.

III. DISCUSSION

A. Standard of Review
This matter was referred to the Magistrate for a report and recommendation pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B).[3] That section further provides that "[a] judge of the court shall *1054 make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).
In construing the terms of section 636(b)(1), the First Circuit has held that a district court need not hold a brand new hearing to satisfy the de novo standard of review. Gioiosa v. United States, 684 F.2d 176, 178-79 (1st Cir.1982). Instead, it is sufficient that the district court review the transcript or tape of the suppression hearing in sufficient detail to make its own determination with regard to each disputed factual finding. See generally Gioiosa, 684 F.2d at 178, and cases cited; see also LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir.), cert. denied ___ U.S. ___, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988) ("To the extent that the magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings"). As there are no substantial objections to the Magistrate's finding of facts with respect to the motion to suppress, the Court's obligation to review the record of the hearing is alleviated and, in the subsequent discussion, the Court will rely in large part on those conclusions.
The First Circuit has noted that the requirement of a "de novo determination" only applies to the Magistrate's factual findings; "issues of a `technical, legal' nature presented to a magistrate are `certainly ... amenable to disposition [by the district court] by appellate type briefing and argument.'" Gioiosa, 684 F.2d at 179, quoting United States v. Southern Tanks, Inc., 619 F.2d 54, 56 (10th Cir.1980). Accordingly, where the parties have disputed legal issues, the Court will weigh and evaluate the arguments of the parties in standard fashion.

B. Motion to Suppress

1. The Relevant Facts
In the spring of 1986, Zygarowski received a letter from the Far Eastern Trading Co. ("Far Eastern"), which stated that Far Eastern could send "youthful material" to the defendant without detection by government authorities. Unbeknownst to the defendant at the time, the Eastern Trading Co. was a front for the United States Postal Service as part of its National Child Pornography Reverse Sting Project known as "Operation Looking Glass," the Postal Service's effort to identify and apprehend purchasers of child pornography.[4] Some time thereafter, the defendant requested a copy of the company's brochure, in which were detailed descriptions of various films depicting children in sexual acts. In January 1987, the defendant submitted an order to Far Eastern for two of the films advertised in the company's brochure.
Approximately six months later, Zygarowski received a postcard from Far Eastern stating that his order would be mailed on June 6, 1987. On June 8, 1987, Postal Inspector John G. Dunn, Jr. submitted an application for a search warrant to Magistrate Patti B. Saris in Boston, Massachusetts. The application was based on a lengthy affidavit signed by Inspector Dunn, and was approved later that afternoon.
In the affidavit, Inspector Dunn stated that at some time between June 10 and June 12, 1987, "a parcel containing the pornographic video tape `Pre-Teen Trio' would be `placed for delivery' to the defendant at his home address." Magistrate's Report at 15, citing Affidavit of Postal Inspector John G. Dunn, Jr., ¶ 18. The parcel was marked both C.O.D. and "restricted delivery," which meant not only that the package had to be paid for upon delivery, but also that it could only be received by the addressee himself. Magistrate's Report at 17.
Based on the testimony of the postal inspectors, Magistrate Ponsor found that they were aware that Zygarowski's normal working hours were between 6:30 a.m. and *1055 3:30 p.m., and that he did not usually come home during that time. The inspectors also knew that the normal delivery time for the defendant's residence was approximately 11:00 a.m. Magistrate's Report at 16. The defendant alleges, and the Court finds no evidence to the contrary, that this information was not contained in Inspector Dunn's affidavit. In addition, Magistrate Ponsor noted that the affidavit did not contain any description of the process by which Inspector Dunn expected that the parcel would be brought into the residence. Magistrate's Report at 15.
Clearly, however, the arrival of the package into Zygarowski's house was important to the government agents, since Magistrate Ponsor concluded that "the information contained in the affidavit would be insufficient to justify a search of the 159 Casey Drive residence unless and until the package containing the video tape cassette ... entered the residence." Id. In light of the defendant's specific challenges to the search as a whole, and specifically to its scope, the means by which the package did enter the house are worth examining closely.
On June 10, 1987, the normal mail carrier for Casey Drive attempted delivery of the parcel at approximately 11:00 a.m. Magistrate's Report at 17. Since the defendant was not home, the mail carrier left Postal Service Form 3849-A at Zygarowski's residence to inform him that he could pick up his package at the Chicopee Post Office after 3:30 p.m. Id.
The defendant, under observation by the postal authority, was seen leaving work and returning to 159 Casey Drive at about 3:30 p.m. After ten to fifteen minutes in the house, the defendant left for the Chicopee Post Office, arriving there at about 3:50 p.m. Magistrate's Report at 18. At the post office, the defendant paid the $94.45 C.O.D. charge and received the parcel containing the videocassette. Id.
The defendant was then observed leaving the post office and returning home at about 4:00 p.m. or shortly thereafter. The inspectors watched the plaintiff enter the house, and initiated the search approximately thirty minutes later. As the inspectors passed the Ford Bronco which the defendant had driven to the post office, they observed a brown paper parcel, now empty, in which the videocassette had been mailed. Id.
When the postal inspectors knocked on the door, the defendant's mother answered. Informed of the search warrant, she called to her son, who was in his room in the basement at the time. While one inspector remained upstairs to talk to the defendant's mother, the remaining four inspectors went downstairs to Zygarowski's room. Magistrate's Report at 19. The search, which was limited to Zygarowski's room, took approximately two and one-half hours, concluding at about 7:00 p.m. Id.
Postal Inspector John N. Cinotti, in charge of the search, approached Zygarowski upon entering the room, showed him the search warrant, and said that he'd like to discuss it with him. Id. The plaintiff was apparently stunned by the warrant, but after five or six minutes, grew more composed. The Magistrate determined that much of Zygarowski's apprehension arose out of the fact that he had just finished a period of probation for mail fraud. Magistrate's Report at 20.
During the search, Zygarowski was never told that he was under arrest or that he had any obligation to cooperate with the postal inspectors during their search. Id. The Magistrate also found that the defendant was never apprised of his Miranda rights or affirmatively told that he could refuse to cooperate with the postal inspectors. Magistrate's Report at 21. The Magistrate concluded that the only time the defendant's freedom of action was in any way constrained was when, in response to a postal inspector's question about weapons, he said that he had a rifle under his bed. As he bent down to retrieve it, the postal inspector told him to step back. The weapon turned out to be an old Spanish bolt-action rifle. Magistrate's Report at 20.
The various pieces of evidence were collected as follows. At some point fairly early in the search, Zygarowski was asked *1056 where the videocassette was that he had picked up from the post office. The defendant reached over, ejected the tape from his VCR and handed it to one of the inspectors. Id. As the search of the 11' × 35' room continued, the postal inspectors also found the material received by Zygarowski from Far Eastern. Magistrate's Report at 21.
The Magistrate states in his Report that during the course of the search,
the defendant showed the inspectors a cardboard box next to his bed containing substantial amounts of other prohibited material. In addition, [the defendant] removed from a large collection of 75 video tape cassettes one cassette containing what he described as a `collage' of child pornography. Upon review, the tape was found to contain not a collage, but a taped encounter by the defendant with a young girl in the defendant's bedroom.
Id. Feeling that the items proffered by the defendant were not explicitly covered by the search warrant, the postal inspectors requested Zygarowski's permission to expand the search and take the additional material. The Magistrate concluded that the defendant agreed to the proposal orally and, in the presence of two witnesses, filled out and signed a "Waiver for Voluntary Search of Person or Premises." Magistrate's Report at 22.
The Magistrate also found that "the defendant was exceedingly nervous and scared throughout the search...." The Magistrate concluded, as noted above, that the defendant was worried about his prior criminal record and the reaction of his parents, neither of whom enjoyed particularly good health. Zygarowski testified at the hearing that he would do whatever it took to get the postal inspectors out of his house.

2. The Defendant's Consent to the Expanded Search Was Voluntary
The defendant argues that the Magistrate erred in concluding that his consent to the expansion of the search was voluntary. Specifically, Zygarowski argues that the Magistrate unreasonably relied on the language of United States v. Bienvenue, 632 F.2d 910 (1st Cir.1980) and United States v. Holmes, 632 F.2d 167 (1st Cir. 1980), in finding that his "will was not overborne" and that his decision to allow the postal inspectors to seize the contested items was "a product of a rational intellect and a free will." Defendant's Objections to Report and Recommendation of the Magistrate Regarding his Motion to Suppress at 5.
Instead, Zygarowski urges this Court to adopt the view that once a law enforcement officer displays a warrant, consent to an expanded search is impossible. As support for that view, the defendant relies on language found in Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). In Bumper, the Supreme Court examined the admissibility of evidence seized during an allegedly consensual search of a house. During the investigation of a rape but prior to any arrest, four white law enforcement officers went to the petitioner Bumper's home, located in an isolated rural area. The petitioner, a black male, was not there at the time, but his grandmother, Hattie Leath, was. The officers told Mrs. Leath that they had a warrant to search her house, but they did not read it or show it to her. Mrs. Leath also testified that the officers did not tell her that they were investigating her grandson. She did testify that she told the officers to go ahead and search the house.
The defendant, identifying with Mrs. Leath, places particular emphasis on the Supreme Court's ultimate pronouncement:
When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion  albeit colorably lawful coercion. Where there is coercion there cannot be consent.
391 U.S. at 550, 88 S.Ct. at 1792. The defendant claims that because the postal inspectors told him when they first appeared that they had a warrant to search his room, and failed to inform him that he could refuse to consent to any expansion of *1057 the search, none of his subsequent actions can be considered consensual. In the Court's view, adopting such a result would contravene the boundaries of the law and common sense.
To begin with, the Supreme Court's decision in Bumper is not so absolute as the above-quoted paragraph would indicate. Instead, an examination of the body of the opinion suggests that the result in Bumper was tied to the particular facts of the case, where it is clear that the Supreme Court harbored suspicions that the law enforcement officers were impermissibly overbearing: "We hold that there can be no consent under such circumstances." Id. at 548, 88 S.Ct. at 1791. The analytic standard that the Supreme Court set forth does leave room for the possibility of consent, even after possession of a search warrant has been announced. Hence, a prosecutor attempting to rely upon consent to uphold the validity of a search "has the burden of proving that the consent was, in fact, freely and voluntarily given." Id. Such freedom and voluntariness cannot be demonstrated, the Bumper court asserted, by a showing of mere "acquiescence to a claim of lawful authority." Id. at 549, 88 S.Ct. at 1792.
In determining whether or not consent was "freely and voluntarily given," this Court must examine "all of the circumstances surrounding the securing of the consent." United States v. Twomey, 884 F.2d 46, 51 (1st Cir.1989); see Crooker v. Van Higgins, 682 F.Supp. 1274 (D.Mass. 1988) (Freedman, C.J.) (Applying "totality of the circumstances" test). Among the factors to which this Court must give "the most careful scrutiny" are the nature of the police questioning, the "possibly vulnerable subjective state of the person" consenting, the person's knowledge of the right to refuse consent, and the environment in which the consent was given. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 229, 247, 93 S.Ct. 2041, 2048-49, 2058, 36 L.Ed.2d 854 (1973). The Schneckloth court specifically held, however, "knowledge of a right to refuse [consent] is not a prerequisite of a voluntary consent." Id. at 234, 93 S.Ct. at 2051 (emphasis added).
Were the United States attempting to justify the introduction of the box of contraband materials and the second videotape on the basis of the plaintiff's mere acknowledgment that the postal authorities had authority to search his room, the Court might be moved to exclude those items. However, this case is quite different from Bumper, to which the defendant claims factual kinship. It is inferable from the Magistrate's Report, for instance, that it was the defendant himself who pointed out the location of the box of materials; there is certainly no indication that he was in any way forced to do so. An even clearer indication of cooperation may be found from the fact that the plaintiff removed from his large collection of videotapes the one film which might possibly have been within the scope of the postal inspectors' search. Having done that much, it does not strain the Court's credulity that his subsequent oral agreement to their seizure and his signing of the waiver were in fact voluntary. As the Magistrate noted, the postal inspectors conducted themselves in a non-threatening way, the defendant was never touched or his freedom of movement impeded, and the inspectors returned to him non-contraband material which he wished to retain. Magistrate's Report at 22-23. The only available evidence pointing to Bumper-esque coercion are the existence of the search warrant itself, the Magistrate's findings regarding Zygarowski's apprehension about his past criminal record, and the inherently disconcerting effect of four law enforcement officers in an enclosed space. The Court finds that under the totality of the circumstances, these factors do not outweigh the strong indicia of free will exhibited by the defendant's own actions.

3. No Material Facts Were Omitted From the Affidavit Submitted in Support of the Search Warrant
Zygarowski argues that four material facts were omitted from Inspector Dunn's affidavit submitted in support of the search warrant for the defendant's home. Specifically, *1058 he argues that the affidavit did not reveal:
 the fact that the videocassette would not be received by the defendant at 159 Casey Drive, but would be picked up by him at the Post Office instead[;]
 the fact that the defendant did not respond to the three most recent items of correspondence sent to the defendant by the postal inspectors in their undercover capacity;
 the fact that, during the five-month delay between defendant's January order and his arrest, the defendant never sought information or inquired as to the film which is the subject of the indictment;
 the fact that the original brochure from "Fareastern Trading Co." indicated that the material was for educational purposes and "did not contain visual depictions of anyone under the age of 18."
Defendant's Objection to Report and Recommendation of the Magistrate Regarding his Motion to Suppress at 7-8.
The Magistrate dismissed the last three "omissions" as simply not material to the question of probable cause to search the house. Magistrate's Report at 25. The defendant's only challenge to that conclusion is that the Magistrate, by looking at each claimed omission separately, failed to consider how those elements taken together affected the "totality of circumstances" surrounding the finding of probable cause.
The Court finds absolutely no error in the Magistrate's analysis of these alleged "omissions" or in his conclusion. The issues raised by the missing information was simply not relevant to the determination of the existence or nonexistence of probable cause facing Magistrate Saris.

4. The Use of an Anticipatory Warrant Was Not Unconstitutional
At the time Inspector Dunn applied for a search warrant of 159 Casey Drive, the package containing "Pre-Teen Trio" was not actually in the house. While recognizing that fact, and noting that certain information was missing, Magistrate Ponsor based his decision that Magistrate Saris had probable cause to believe the package would be at 159 Casey Drive on the following three factors. First, the affidavit did not mislead Magistrate Saris by stating that the package would be received by the defendant at his home; it merely stated that the package would be "placed for delivery to the defendant at the residential address." Magistrate's Report at 28-29. Second, the Magistrate pointed out that if the government had in fact arrested Zygarowski outside of the Chicopee Post Office, they might well have lost the chance to prove that the defendant knowingly received the contraband material. Since mere possession is not sufficient to prove the crime with which the defendant is charged, the government had a legitimate interest in waiting until the package entered Zygarowski's home before initiating the search. Magistrate's Report at 29-30. Third, the Magistrate concluded that the package was "on a sure course to its destination," and that accordingly, the issuance of an anticipatory warrant was permissible. Magistrate's Report at 30, citing United States v. Hale, 784 F.2d 1465, 1468-69 (9th Cir.), cert. denied, 479 U.S. 829, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986).
The fact that a search warrant for a residence is issued prior to the arrival at the residence of some contraband is not a violation of the Constitution per se. See United States v. Garcia, 882 F.2d 699 (2d Cir.1989) ("[t]he fact that the contraband is not `presently located at the place described in the warrant' is immaterial, so long as `there is probable cause to believe that it will be there when the search warrant is executed,'" citing United States v. Lowe, 575 F.2d 1193, 1194 (6th Cir.), cert. denied, 439 U.S. 869 (1978)). Although the constitutionality of anticipatory warrants has been upheld by a number of courts, Garcia, 882 F.2d at 702-703 (collecting cases), the validity of such warrants is a question of first impression in the First Circuit.
While the use of the anticipatory warrant provides the government with a more flexible approach to law enforcement, it is still incumbent upon government officials *1059 to demonstrate to a magistrate that delivery of the contraband to the residence will or is likely to occur. Garcia, 882 F.2d at 702, citing United States ex rel, Beal v. Skaff, 418 F.2d 430, 433-34 (7th Cir.1969).
A small but growing body of case law has arisen which discusses the circumstances under which a magistrate can be reasonably certain that the contraband will be on the property at the time the search warrant is executed. In analyzing the validity of anticipatory warrants arising out of precisely the same government sting operation as the present case, the Fourth Circuit has twice stated that "where the contraband to be seized `is on a sure course to its destination, as in the mail, prior issuance of a warrant is permissible.'" United States v. Goodwin, 854 F.2d 33, 36 (4th Cir.1988) (quoting Hale, 784 F.2d at 1468); United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989); accord Garcia, supra (collecting cases) and United States v. Washington, 852 F.2d 803 (5th Cir.1988).[5]
Zygarowski claims that Postal Inspector Dunn omitted certain information which would have gnawed away at the foundations of probable cause upon which the search warrant was based. Zygarowski also argues to this Court that the facts of his case more nearly fit the earlier case of United States v. Hendricks, 743 F.2d 653 (9th Cir.1984), cert. denied, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985), in which the Ninth Circuit invalidated a warrant issued at a time when it was absolutely clear that the defendant had to pick up the package allegedly containing contraband. At the time the search warrant was issued, the package was in the hands of Drug Enforcement Administration agents at the airport. In the Court of Appeals' view, "there was no assurance [Hendricks] would pick up the box or that he would take it to the house." Hendricks, 743 F.2d at 655. The Ninth Circuit was careful to distinguish the facts before it from the situation where a package is "on a sure course to the house, ... [such as] in the mail addressed to the home address...." Id.; see Hale, 784 F.2d at 1468-69.
This Court recognizes that there is at least one major difference between the instant case and both Dornhofer and Goodwin, supra. In the latter two cases, both defendants had already paid for their orders, so there was no need for the delivery to be either restricted or C.O.D. In Zygarowski's case, of course, the postal inspectors (but not Magistrate Saris) knew that the defendant would probably have to retrieve it from the post office. Nonetheless, the Court concludes that the difference is not significant and unlike Hendricks, the package was not solely in the control of government agents, but was released for delivery in the normal stream of mail on a sure course for the defendant's home address; there was a possibility, however small, that the defendant would be at home to receive the package; and there was a very strong likelihood that the defendant, given the nature of the package, would return home with it once he had picked it up. Magistrate Saris had adequate information before her to determine the existence of probable cause that the package would be at 159 Casey Drive when the search warrant was executed, and Magistrate Ponsor did not err in finding the issuance of the warrant valid.

C. Motion for Specific Performance
Zygarowski alleges that during the course of discussions between his attorney and the government prosecutor, the parties agreed that if he underwent evaluation by a psychotherapist, the government would make a sentencing recommendation commensurate with the therapist's evaluation. *1060 As noted above, the Magistrate's ruling with respect to the defendant's motion for specific performance was based on the facts as set forth by the defendant. The Magistrate concluded that even if the government had made a promise and subsequently broken it, the defendant would not be entitled to specific performance in light of the relevant case law. The Court, while disagreeing with the Magistrate's legal conclusion, finds from the evidence elicited at the hearing that the government in fact did not make any promise to the defendant, and accordingly upholds the Magistrate's recommendation that the defendant's motion for specific performance be denied.

1. The Defendant Did Give Up a Constitutionally Significant Interest
Both the government and the Magistrate agree that even if the government did make the alleged promise, the government is not bound to adhere to it because the defendant did not give up any significant interest in return. In light of the importance of this issue, the Court indulges in a brief review of the law surrounding the legal haggling between prosecutors and criminal defendants.

a. Privacy Rights
In the Court's view, the first question to be resolved is whether or not the defendant gave up any significant interest during the course of trial negotiations by allowing the government to see Dr. Hobson's report. The defendant claims that the Supreme Court has recognized a "right of confidentiality" with respect to the dissemination of personal information given to a doctor by a patient, citing Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-77, 51 L.Ed.2d 64 (1977). However, it is difficult for this Court to wholeheartedly subscribe to that view in light of the fact that in Whalen, the Supreme Court upheld a New York statute requiring central filing of the names of all patients prescribed "Schedule II" drugs,[6] specifically concluding in the process that the New York disclosure law was not "sufficient to constitute an invasion of any right or liberty protected by the Fourteenth Amendment." Id. at 604, 97 S.Ct. at 878. Moreover, the Supreme Court, while acknowledging the "individual interest in avoiding disclosure of personal matters," id. at 599, 97 S.Ct. at 876, neither explicitly adopted nor rejected the district court's specific finding that "`the doctor-patient relationship is one of the zones of privacy accorded constitutional protection.'" Id. at 596, 97 S.Ct. at 875. The Court specifically noted that the common law does not recognize a "physician-patient evidentiary privilege," and where such a privilege has been enacted by statute, it is frequently subject to numerous exceptions. Id. at 602 n. 28, 97 S.Ct. at 877-78 n. 28.
Greater support for the defendant's claim to a right of privacy can be found in the small number of circuit cases which have specifically recognized a psychotherapist-patient privilege. See, e.g., In re Zuniga, 714 F.2d 632 (6th Cir.), cert. denied, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983) (concluding that such a privilege is mandated by "reason and experience," Fed. R.Evid. 501, and collecting cases). However, recognition of this privilege is not uniform. See, e.g., In re Grand Jury Proceedings, 867 F.2d 562 (9th Cir.1989) (noting that ninth circuit has not recognized privilege and declining to reach the issue); United States v. Kinslow, 860 F.2d 963 (9th Cir.1988) (noting recognition of privilege by other federal courts but not taking a position); United States v. Friedman, 854 F.2d 535 (2d Cir.1988) (leaving open question whether or not privilege exists); United States v. Corona, 849 F.2d 562 (11th Cir.1988) (no such privilege exists); United States v. Bercier, 848 F.2d 917 (8th Cir.1988) (no such privilege exists in federal criminal proceedings); Pesce v. J. Sterling Morton High Sch. Dist., 830 F.2d 789 (7th Cir.1987) (implicitly recognizing privilege, but holding privilege outweighed by legitimate state interest); United States v. *1061 Crews, 781 F.2d 826 (10th Cir.1986) (leaving open question whether or not privilege exists); Caesar v. Mountanos, 542 F.2d 1064 (5th Cir.1976) (right of privacy extends to psychotherapist-patient communications, but is not absolute).
The First Circuit's position regarding whether or not such a privilege exists is at best ambiguous. In Borucki v. Ryan, 827 F.2d 836 (1st Cir.1987), the First Circuit refused to endorse this Court's conclusion that as of June 1973, it was clearly established that information contained in a psychiatric report was "protected by the confidentiality branch of the constitutional right of privacy." See Borucki v. Ryan, 658 F.Supp. 325, 330 (D.Mass.1986) (Freedman, C.J.). The First Circuit concluded that "given ... the split in the circuits, we believe that it was not clearly established that a constitutional privacy right would even be implicated by Ryan's disclosures of information in Borucki's psychiatric report." Borucki, 827 F.2d at 848 (emphasis in the original). See also United States v. Barrett, 766 F.2d 609, 616 & n. 8 (1st Cir.1985) (holding that court need not decide whether or not psychotherapist-patient privilege exists).
More recently, however, the First Circuit has shown a slightly greater degree of warmth towards the psychotherapist-patient privilege. In Daury v. Smith, 842 F.2d 9 (1st Cir.1988), Daury, a former school principal, challenged as an invasion of his privacy a decision by the local school committee which required him to see a psychiatrist as a condition of returning to work following three altercations on school property. The school committee received a copy of the report written by Dr. Culley, the psychiatrist who saw Daury, and at some point, invited Dr. Culley to a committee meeting to discuss his report. Daury then filed suit against the committee. The First Circuit, citing Whalen, agreed that the right to privacy is well-established, but noted that "the privacy right ... must often give way to considerations of public interest." Daury, 842 F.2d at 13. In Daury's case, the First Circuit found that there "is a legitimate public interest in providing a safe and healthy educational environment," and that a school committee may justifiably compel such a psychiatric examination of a teacher if the committee feels it necessary to ensure the welfare and safety of the students. Id. at 14.
Daury represents a concrete application of the balancing test (privacy right versus public interest) applied by the majority of courts which have recognized the existence of the pyschotherapist-patient privilege. See Borucki, 827 F.2d at 848. Although the Borucki court explicitly declined to state whether or not the use of such a balancing test was appropriate, id. at 848 n. 21, it now appears that the First Circuit, at least implicitly, has adopted that approach.
In this case, the balancing test clearly tilts in the defendant's favor. The government has demonstrated to this Court no public interest which was served by the defendant's disclosure of Dr. Hobson's report to the government. Since trial had not commenced, it cannot be said that the defendant had put his mental condition at issue, nor was any suggestion made of a general threat to public safety such as might support pre-trial detention and examination.
The Court's conclusion that the defendant has given up his privacy with respect to the report is not altered in any way by the government's protestations that the material will not be introduced against the defendant at trial. In this Court's view, the right of privacy would be virtually meaningless if the only protection it provided was that personal information would not be introduced against a person at trial.
Having decided that the defendant did give up a significant interest by allowing the government to see the results of his psychotherapist's evaluative report, the next question to be answered is whether or not it is the kind of interest which may serve to bind the government to a promise made during the course of trial negotiations.

b. Trial Negotiations
In 1971, the Supreme Court in Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, *1062 30 L.Ed.2d 427 (1971), for the first time held that a defendant could enforce a bargain struck with the government during plea negotiations, although the specific remedy to be applied was left to the state court. Id. at 263, 92 S.Ct. at 499. The Supreme Court elaborated on binding plea bargains in Mabry v. Johnson, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984), writing that
[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution. Only after respondent pleaded guilty was he convicted, and it is that conviction which gave rise to the deprivation of respondent's liberty at issue here.
Id. at 507-08, 104 S.Ct. at 2546 (footnotes omitted).
In this Court's view, recent decisions by the First Circuit have expanded the range of governmental promises which can be enforced by defendants. In United States v. Papaleo, 853 F.2d 16 (1st Cir.1988), for instance, a case upon which the government places a great deal of reliance, the First Circuit refused to uphold a governmentally-withdrawn plea agreement because the defendant "did not enter a guilty plea, did not forgo a jury trial on any charge, and did not otherwise detrimentally rely on the Government's promise...." Id. at 18 (emphasis added). See also United States v. Abou-Saada, 785 F.2d 1, 5-7 (1st Cir.1986), cert. denied sub nom. Tannous v. United States, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986) (It was reversible error for district court judge not to hold a hearing to determine if defendant's participation in drug transaction was predicated on government's promise not to arrest or prosecute him.).[7]
Putting aside for the moment the question of whether or not a promise was made, it is clear that Zygarowski can show detrimental reliance. Specifically, he spent over $3,000 of his own money for analysis by a psychotherapist specializing in pederasty and pedophilia, and far more importantly, gave up valuable privacy rights by allowing the government to see the written conclusions of the therapist. If it could be shown that Assistant United States Attorney ("AUSA") Via did promise to make a sentencing recommendation commensurate with Dr. Hobson's penal recommendation, then it is clear to this Court that she would be bound to do so.

2. The United States Made No Binding Promise to the Defendant
In light of the fact that the parties fiercely contested whether or not such a promise was made, the Court found it necessary to hold an evidentiary hearing to determine the issue.[8] The Court notes that the First Circuit has held that "plea agreements, though part and parcel of criminal jurisprudence, are subject to contract-law standards in certain respects." United States v. Hogan, 862 F.2d 386, 388 (1st Cir.1988). The evidence offered by the parties at the hearing was evaluated with that principle in mind.
Attorney Kelly, defendant's counsel, stated that on July 8, 1987, he met with AUSA Susan Via in her office in Boston to discuss the defendant's case. Kelly testified that he had represented Zygarowski in *1063 a previous matter before this Court, and was certain that if his client went to trial, there was the strong possibility that he would receive a stiff sentence upon conviction. Accordingly, he asked Via about possible resolutions which would lead to non-incarceration. Kelly then stated that Via told him that if Zygarowski was willing to undergo a comprehensive evaluation by Dr. Hobson, she would abide by his recommendation regarding punishment. Specifically, he quoted her as saying, "We'll recommend what Bill Hobson recommends." According to Attorney Kelly, the defendant would not have spent this money or undergone the testing without some sort of promise by the government.
Via's testimony differed from that of Attorney Kelly in several important particulars. Heavily persuasive is her testimony that at the time she first met with Attorney Kelly on July 8, 1987, he was still treating the arrest as a mere possessory crime. However, Via testified, by that time she had been informed by the postal inspectors who conducted the search that material had been found which suggested activity beyond mere possession, including the possible molestation of a girl approximately five years in age. Under the circumstances, Via said, she would never have agreed to abide by any report which might recommend that the defendant not be incarcerated. In her view, the case clearly called for a government recommendation of incarceration and accordingly, the most she would have promised would be to take Dr. Hobson's report into account when she determined what that recommendation would be.
As the Court stated at the time, the hearing was not to determine the credibility of opposing counsel, both of whom testified forthrightly and emphatically. Instead, it was to hear the competing evidence and determine what was the most likely course of events during the negotiations between the attorneys. It is apparent that at some point, the parties' understanding of what was happening diverged; the Court explicitly refrains from saying that one or the other party was at fault. Confusion undoubtedly arose from the passage of time, the fact that various options were simultaneously under discussion, and so forth. However, in weighing the probabilities of the matter under review, the Court finds it highly unlikely under the circumstances that the United States government would have agreed at such an early stage in the proceedings to bind itself to the recommendation of a private psychotherapist, however favored or trusted by the government. This is particularly true if Via was aware at the time of the attorneys' initial meeting (and the Court finds that she was) that more was involved than the defendant's simple possession of contraband material. The letters exchanged by the parties following this meeting and during the pendency of Dr. Hobson's observation of the defendant have been reviewed by the Court, and only serve to illustrate the fact that the parties failed to have a meeting of the minds at any point during the succeeding eighteen months. However, since the responsibility for that state of affairs cannot be laid solely at the feet of the government, the Court holds that no unequivocal promise was made by Via sufficient to bind her to a recommendation commensurate with Dr. Hobson's report.

IV. CONCLUSION
For the reasons set forth above, the defendant's objections to the Magistrate's Report and Recommendation are hereby OVERRULED. The Magistrate's recommendation that the defendant's motions to suppress evidence and for specific performance be denied is hereby ADOPTED.
It is So Ordered.

SUPPLEMENTAL MEMORANDUM AND ORDER

On Motion For Reconsideration
The Court is in receipt of defendant Robert Zygarowski's motion for reconsideration of defendant's motion for an order requiring specific performance. Defendant seeks to correct an error contained in his original motion, and argues that in light of the correction, the Court should alter its decision.
*1064 While noting the defendant's correction, the Court concludes that there is no need to change its conclusion. As counsel undoubtedly recognizes, the Court substantially adopted the defendant's view of the law with respect to the issue of plea bargain negotiations, the proofreading error aside. What the Court did not adopt was the defendant's view of the factual situation. Having found that the government did not make the alleged promise to the defendant, the Court has nothing to which to bind the government.
The defendant's motion for reconsideration is DENIED.
It is So Ordered.
NOTES
[1] 18 U.S.C. § 2252(a)(2) states:

(a) Any person who
....
(2) knowingly receives, or distributes, any visual depiction that has been transported or shipped in interstate or foreign commerce by any means including by computer or mailed or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if 
(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
(B) such visual depiction is of such conduct; shall be punished as provided in subsection (b) of this section.
[2] A second count of the indictment seeks criminal forfeiture under 18 U.S.C. § 2253(a)(2) (now codified at 18 U.S.C. § 2253(a)(3)) of a Ford Bronco automobile, a color television and a videocassette recorder, used respectively to transport and view the videocassette.

18 U.S.C. § 2253(a)(3) states as follows:
(a) Property Subject to Criminal Forfeiture.  A person who is convicted of an offense under this chapter involving a visual depiction described in sections 2251, 2251A, or 2252 of this chapter shall forfeit to the United States such person's interest in 
....
(3) any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.
[3] 28 U.S.C. § 636(b)(1)(B) provides in relevant part as follows:

(b)(1) Notwithstanding any provision of law to the contrary 
(B) a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)....
[4] For a good summary of Operation Looking Glass, see United States v. Goodwin, 854 F.2d 33, 34-36 (4th Cir.1988).
[5] The Court cites for research purposes only four other Fourth Circuit cases: United States v. Walters, 867 F.2d 610 (Table) (4th Cir.1989); United States v. Szymanski, 867 F.2d 610 (Table) (4th Cir.1989); United States v. York, 867 F.2d 610 (Table) (4th Cir.1989); and United States v. Flippen, 861 F.2d 266 (Table) (4th Cir.1988). Pursuant to the rules of the Fourth Circuit, these unpublished dispositions have extremely limited precedential value; however, they are listed because they deal with similar or identical issues arising out of the same postal service operation. The text of each decision is available on Westlaw.
[6] "These include opium and opium derivatives, cocaine, methadone, amphetamines, and methaqualone. Pub. Health Law § 3306. These drugs have accepted uses in the amelioration of pain and in the treatment of epilepsy, narcolepsy, hyperkinesia, schizo-affective disorders, and migraine headaches." Whalen, 429 U.S. at 593, n. 8, 97 S.Ct. 873, no. 8.
[7] The Court read with extreme care the pages cited by the defendant in his brief, and was utterly unable to locate the quote attributed to the First Circuit on pages 5-6 of the defendant's memorandum with respect to the motion to suppress. The Court is troubled that it is unable to do so, in light of the fact that the defendant is allegedly quoting the First Circuit, and in light of how persuasive such a quote would be if it existed. The non-existence of this quote is particularly unfortunate in that it detracts from what is an otherwise convincing legal argument.
[8] At the time of the hearing, the Court reminded each party, and both agreed, that resolution of this matter might have little practical effect in light of the fact that disposition of the defendant upon a possible conviction rests solely in the Court's discretion. However, the Court undertook the hearing and this subsequent discussion in light of the Court's recognition of the importance of the constitutional principles involved.