**UNITED STATES FIRE INSURANCE COMPANY, etc., Plaintiff, Appellee,**

v.

**PRODUCCIONES PADOSA, INC., etc., Defendant, Appellant.**

No. 87–1016.

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1987.

Decided Dec. 30, 1987.

Harry Anduze Montano, Santurce, P.R., for defendant, appellant.

Jay A. Garcia–Gregory with whom Diego A. Ramos and Fiddler, Gonzalez & Rodriguez, San Juan, P.R., were on brief, for plaintiff, appellee.

Before BREYER and SELYA, Circuit Judges, and LAGUEUX,* District Judge.

SELYA, Circuit Judge.

This appeal is taken from a judgment of the United States District Court for the District of Puerto Rico favorable to United States Fire Insurance Company (USF), plaintiff/appellee, and adverse to USF's insured, defendant/appellant Producciones Padosa, Inc. (Padosa). We have wended our way through the intricacies of the record and the crotchets of insurance law, and have considered all of the appellant's (sometimes incondite) protestations. With that exercise behind us, we affirm.

## I. BACKGROUND

In September 1982, USF issued an insurance policy to Padosa covering the latter's

*Of the District of Rhode Island, sitting by designation.

1972 Beech A100 aircraft. The policy was to expire on September 2, 1983. It contained several "exclusions", one of which (Exclusion 2) made the insuring agreements inapplicable,

> to any occurrence or to any loss or damage occurring while the aircraft is operated in flight by other than the pilot or pilots set forth [in] ... the Declarations[.]

The "declarations" contained a "pilot clause" which stipulated in no uncertain terms that,

> Only the following pilot or pilots holding valid and effective pilot and medical certificates with ratings as required by the Federal Aviation Administration for the flight involved will operate the aircraft in flight:
>
>> Pilots who have a current commercial or airline transport certificate and a multiengine and instrument rating and a minimum of 3000 logged pilot hours of which at least 1000 hours have been as pilot in command of multiengine aircraft including at least 500 hours in turbine aircraft and at least 50 hours in the same make and model aircraft as [described in the policy, namely, the 1972 Beech A100]; otherwise, Stanley Robles or Jose Pumares.

The policy also contained a standard lienholder clause, guaranteeing payment to Padosa's chattel mortgagee, the Chase Manhattan Bank, whether or not USF had coverage defenses against the insured.

The plot thickened in April 1983 when Padosa requested that yet a third pilot, Julio Cesar Otero Rivera (Otero), be specifically named in the pilot clause. This subject was first broached by Padosa's insurance broker, Adriano Valle, to Gustavo Martinez, a vice-president of Professional Underwriters Insurance Company (PUI). Martinez was joined to appellee by a slender thread: a PUI subsidiary from time to time received policy applications in the ordinary course and referred them to an agent of USF, Aviation Office of America (AOA). On this occasion, Martinez communicated Padosa's request to AOA, after receiving assurances from Valle about Otero's credentials. As matters turned out, the chief source of Valle's information was a letter which Otero's previous employer, Crown Air, had sent to Padosa. That letter stated in substance that Otero had logged 1200 hours of flight time in a Jetstream (turbine) aircraft. Apart from this billet-doux, Padosa had not bothered to obtain any other particulars concerning Otero's flying record. And future events proved that the letter itself was suspect: Crown Air apparently took Otero's word as to the extent of his logged flight time. Based on Valle's representations and assuming them to be accurate, Martinez told AOA that Otero had 1200 hours in a turboprop and 300 hours in a jet.

AOA inquired whether Otero's flight record also included the required 50 hours "same make and model" flight time. On April 29, Martinez—apparently relying on what Padosa, through Valle, had told him—responded that he could "confirm that Julio ha[s] 150 hours on a King Air 100. Also has pilot turbo prop similar to King Air with 1,500 logged [hours]."[1] Martinez again sought approval of Padosa's request. A few days later, AOA telexed Martinez that Otero would be covered under the policy *provided* he had actually flown the advertised 150 hours as pilot in command of an aircraft of the same make and model as that owned by Padosa. Martinez then telephoned Valle to inform him that coverage had been extended to embrace Otero.

In the same time frame, also at Valle's urging, Martinez requested AOA to modify the pilot clause to reduce the minimum number of "same make and model" pilotage hours from 50 to 25. USF agreed. In July 1983, it issued a written endorsement to Padosa which updated the pilot clause. Although the paperwork was not physically

---

1. The parties do not question that a King Air 100 was a kindred "make and model" vis-a-vis Padosa's Beech A100. Be that as it may, Otero in fact had far fewer than 150 hours—or even 50 hours—in that plane or in any aircraft of the "same make and model" as Padosa's. After the crash, *see* text *infra*, Otero laid claim to less than 28 hours of flying time at the controls of such an aircraft. Even that boast proved to be unsubstantiated.

transmitted until July 19, the endorsement became effective on July 7. There is no real question but that the endorsement was received before the crash.[2] It provided:

> In consideration of the premium charged, it is agreed that the typewritten portion of [the pilot clause] of the Declarations is changed to read as follows:
>
> Pilots who have a current commercial or airline transport certificate and a multiengine and instrument rating and a minimum of 3000 logged pilot hours of which at least 1000 hours have been as pilot in command of multiengine aircraft including at least 500 hours in turbine aircraft and at least 25 hours in the same make and model aircraft as [is described in the policy]; otherwise, Stanley Robles or Jose Pumares.

On August 17, 1983, the balloon went up when the plane went down. Otero crashed the aircraft on takeoff. During the ensuing investigation, USF discovered that Otero had less that 400 hours of turbine aircraft flying time, little of which was as pilot in command. Other significant discrepancies surfaced as well. In March 1984, the insurer disclaimed coverage, citing both Otero's lack of proper credentials and a breach of the policy's cooperation clause. Notwithstanding its disclaimer, and in pursuance of its contractual obligations, USF eventually paid the lienholder, Chase Manhattan, the balance due under the chattel mortgage ($225,841.36).

## II. PROCEEDINGS BELOW

Invoking diversity jurisdiction, USF sued Padosa in federal district court to recoup the monies paid to Chase Manhattan.[3] Padosa answered and counterclaimed, asserting that USF had wrongfully failed to honor the insurance contract. Appellant contended, in essence, that Otero met the (modified) pilot clause requirements or, if he did not, that when Padosa permitted Otero to fly the aircraft, it did so in the good faith belief that he had satisfied those requirements. After discovery had been conducted, cross motions for summary judgment ensued.

The district court allowed appellee's motion. It found the pilot clause, in conjunction with Exclusion 2, to constitute a resolutory condition under the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 3041 (1968). As such, Otero's inability to measure up to the criteria limned by the clause served to avoid coverage for the loss of the aircraft. Concomitant with this ruling, the district court rejected Padosa's summary judgment initiative.

---

2. The record contains no specific acknowledgement of Padosa's receipt of the written endorsement, but the fair inferences, we think, conduce ineluctably to the conclusion that the document was received in the ordinary course well before the mishap of August 17, 1983. The endorsement was dated, addressed to Padosa at its customary address, issued to form part of the subject policy, duly countersigned by the same company representative who signed the other policy documents, and sent within the time frame predicted by Martinez. USF's "file copy" was mechanically date-stamped with the inscription: "Mailed July 19, 1983." The endorsement was included as part of the insurance contract in the files of all concerned, and so appeared in the record of the court below. There is no basis for any conclusion but that the endorsement was mailed on July 19 and received shortly thereafter. *See generally Rosenthal v. Walker,* 111 U.S. 185, 193–94, 4 S.Ct. 382, 386, 28 L.Ed. 395 (1884) (mailing gives rise to presumption that document mailed "reached its destination at the regular time and was received by the [addressee]"); *Meckel v. Continental Resources Co.,* 758 F.2d 811, 817 (2d Cir.1985) (showing of regular office procedure suffices to show mailing; presumption that notice was thereafter delivered endures notwithstanding addressee's naked denial of receipt). Indeed, in the case at bar USF's burden is the lighter as appellant has never denied contemporaneous receipt of the endorsement. *Cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (under Rule 56, moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim") (emphasis in original).

3. The lienholder's warranty agreement in the policy not only protected Chase Manhattan, *see* text *supra* at 951, but also stipulated that, if the insurer became obliged to pay a lienor notwithstanding that some act or omission of the insured had defeated coverage generally, then the insured would, upon demand, reimburse the carrier. In this instance, USF contended that coverage, overall, had been dissipated both by Otero's shortcomings and by the cooperation clause violation.

Appellant, having crashed yet again, lost little time in revving up this appeal.

## III. THE SUMMARY JUDGMENT STANDARD

We can reverse a grant of summary judgment only if we find that "issues of fact which were adequately raised before the district court need to be resolved before the legal issues in the case may be decided." *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 986 (1st Cir. 1983). In such circumstances, Fed.R.Civ.P. 56 requires a reviewing court to be "fully satisfied that there is no genuine dispute as to any relevant fact issue and that the appellee is, as a matter of law, due the relief which the district court awarded." *Advance Financial Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 26 (1st Cir.1984); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). To be "relevant" in this sense, a factual imbroglio must be material:

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, controversies about material facts must also be genuine. *Id.* Then, too, as we have said, they must be "substantial." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). In sum, the district court must make a threshold determination of "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2511.

In conducting this tamisage, we must view the evidence, and all inferences extractable therefrom, in the light most flattering to the nonmovant. *United States v.*

*Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Because in this instance the trial court was confronted with cross motions for summary judgment, the inferences to be drawn may shift from one to the other, depending upon which motion is under consideration. *See L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 28 (1st Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). But here, even if we position all of the material facts in the record to the best advantage of Padosa, the outcome is not to appellant's taste.

## IV. DISCUSSION

We look first to the principles of substantive law which control our decision in this matter, and then proceed to fuse the law with the undisputed facts of record.

■ A. *Legal Principles.* Paying appropriate homage to the teachings of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), and accepting the parties' concession as to the applicable rules, *see Mathewson Corp. v. Allied Marine Industries, Inc.*, 827 F.2d 850, 853 n. 3 (1st Cir.1987), we use the law of the forum. Yet, although the central dispute in this case arises from an insurance policy, the Insurance Code of Puerto Rico seems to us to shed precious little light on the question of whether Exclusion 2, in concert with the pilot clause, operated to void the coverage. To be sure, appellant cites as controlling a provision of the Insurance Code which provides that:

> All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of acts, and incorrect statements shall not prevent a recovery under the policy unless:
>
> (1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy, or would not have issued [it] in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts has been made known to the insurer as required either by the application ... or otherwise.

When the applicant incurs in any of the actions enumerated in paragraphs (1), (2), and (3) of this section, the recovery shall only be prevented if such actions or omissions contributed to the loss that gave rise to the action.

P.R. Laws Ann. tit. 26, § 1110 (1976).

In our view, however, the contention that § 1110 carries the day is misguided. In the first place, the parties have referred us to no local caselaw which elongates the enactment to grip a specific policy *exclusion* like that contained in USF's contract with Padosa. Secondly, in other jurisdictions where the statutory mosaic resembles that of Puerto Rico, it is clear that such a "no harm, no foul" law does not reach so far. Massachusetts, for example, has long had a counterpart provision to § 1110.[4] In *Edmonds v. United States*, 492 F.Supp. 970 (D.Mass.1980), *aff'd*, 642 F.2d 877 (1st Cir. 1981), the district court considered the effect of the interaction between an exclusion and a pilot clause similar to those presently before us. The court reasoned, correctly we think, that the critical factor was whether the exclusionary language constituted a condition precedent to coverage as opposed to a simple representation. *Id.* at 974. The distinction was drawn along the following lines:

[A] statement made in an application for a policy of insurance may become a condition of the policy rather than remain a warranty or representation if: (1) the statement made by the insured relates essentially to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under the policy either by using the precise words 'condition precedent' or their equivalent.

*Id.* (quoting *Charles, Henry & Crowley Co. v. Home Insurance Co.*, 349 Mass. 723, 726, 212 N.E.2d 240, 242 (1965)). Applying this test, the district court determined the exclusion to be in the nature of a condition precedent. 492 F.Supp. at 974–75.

*Edmonds* is most instructive. Under the guidelines which it suggests, the policy language *sub judice* plainly amounts to a condition precedent to the attachment of coverage. In point of fact, USF's recitation of the pilotage requirements in the original declarations and its restatement of the same in the July 1983 endorsement make it manifest that Padosa's anticipated compliance therewith was a decisive consideration in the insurer's decision to bind coverage. Given the holotomy between these requirements and the policy as a whole, the nexus was more than sufficient. We said as much in *Edmonds:*

The first branch of the standard is satisfied because the [pilot clause's] requirement has a rational relationship to [the insurer's] decision to issue the policy.

642 F.2d at 833 (footnote omitted).

On the second furculum of the test, it cannot be gainsaid that here, as in *Edmonds*, the pilot clause "is specifically made the subject of an exclusion." *Edmonds v. United States*, 492 F.Supp. at 975. In the bargain, it explicitly limits coverage to fliers who have, among other credentials, "at least 500 hours in [a] turbine aircraft." Though the phrase "condition precedent" does not appear, the policy format is unmistakable in its purport. The structure and phraseology, and the specific incorporation of the clause's assurances

4. Mass.Gen.Laws Ann. ch. 175, § 186 reads as follows:

No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss.

into Exclusion 2, combine to make the whole functionally equivalent to a direct statement that the stipulations of the pilot clause comprise a condition precedent to recovery on the policy. *See Edmonds,* 642 F.2d at 883. Any other construction would both mock common sense and lead inevitably to the nanization of the pilotage requirements. Coverage, like other important rights, cannot be made artificially to depend solely on the presence or absence of talismanic terms or contrived buzzwords.

Treating the exclusionary language in USF's policy as a condition precedent finds support, as well, in the local law. Under Puerto Rico precedent, when the Insurance Code fails to speak conclusively to an insurance-related issue, the Civil Code is often referenced as a supplemental source of law. *See Casanova Diaz v. Puerto Rican–American Insurance Co.,* 106 D.P.R. 689 (1978); *Sandoval v. Puerto Rico Life Ins. Co.,* 99 D.P.R. 287 (1970). According to the Civil Code, "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." P.R.Laws Ann. tit. 31, § 3471 (1968). Another (parallel) provision of the Civil Code indicates that "[i]n conditional obligations, the acquisition of rights, as well as the extinction or loss of those already acquired, shall depend upon the event constituting the condition." *Id.* at § 3042. Applying these precepts to the contract documents before us reinforces our belief that we must treat the exclusion as a condition precedent. *Cf. Compass Ins. Co. v. Vanguard Ins. Co.,* 649 F.2d 331, 335–36 (5th Cir.1981) (under law of Louisiana, a civil code jurisdiction, pilot certification clause comprises policy exclusion rather than representation or warranty).

For these reasons, we hold that Exclusion 2, read in harmony with the pilot clause, constituted an express condition precedent to coverage, breach of which automaticially served to void USF's obli-gations to Padosa under the policy. We further hold that the insured's misstatement of Otero's qualifications amounted, as a matter of law, to such a breach.[5] That being so, it remains only to comb the record to ascertain whether any of the material facts necessary to a determination of this issue were genuinely disputed in the district court.

B. *The Fact/Law Fusion.* We start our analysis of this point by acknowledging that, at trial, USF would bear the burden of proving that Padosa failed to comply with the conditions of coverage. *See Rios v. Niagara Fire Ins. Co.,* 33 D.P.R. 809 (1924). The district court found that the insurer had adroitly shouldered this burden at the summary judgment stage by demonstrating the absence of any "material" and "genuine" factbound controversy. We agree.

■ It is beyond cavil that Otero had fewer than 500 hours of experience in flying turbine aircraft. Indeed, appellant produced not a shred of evidence to suggest the contrary. Thus, unless legally excused, the patent breach of the condition precedent extinguished the insured's right to indemnity under the policy. *See* P.R. Laws Ann. tit. 31, § 3042 (1968). Padosa claims that two such "legal excuses" attend this case. We examine each in turn.

■ 1. *The Alleged Binder.* Padosa's principal assertion in this regard is that, notwithstanding Otero's inexperience, the pilot clause was not offended because USF had expressly agreed to afford coverage while Otero was at the controls (or at least, there was a legitimate question of fact on this score). This thesis has its genesis in the idea that Martinez, acting for USF, bound the insurer to extend such coverage; it relies heavily upon Martinez's oral confirmation to Valle—after receipt of the May 2 telex from AOA—that Otero had been "ac-

---

5. Because of this, it is not of critical consequence whether Otero's dearth of experience contributed to the accident. We therefore express no opinion upon this subject, beyond remarking that pilot error is not, on the face of things, an improbable cause of a crash on takeoff. *See generally Ramirez v. Clinica Perea, Inc.,* 108 D.P.R. 477 (1982) (discussing "contribution to loss" requirement).

cepted" by USF as a pilot.[6] Our recension of this construct requires us to ask, initially, whether Martinez had the power to bind USF, and if so, what legal ramifications would ensue.

The record is clear that Martinez was not a general agent for the company. Nor was he authorized to issue policies on its behalf. His role was exclusively as an intermediary, shuttling information between the broker and AOA. Under Puerto Rico law, agency may be express or implied. P.R. Laws Ann. tit. 31, § 4422 (1968). Agency likewise may be "general or special. The former includes all business of the principal. The latter, one or more specific transactions." *Id.* at § 4424. Taking what transpired most favorably to Padosa, it might be said that, when Martinez received the provisional "green light" from AOA, he became authorized to transmit that information, thereby binding USF. But even if Martinez had some such authority, the effect of any word-of-mouth binder conveyed by him would not impede the entry of summary judgment for the insurer in this action.

Under the Insurance Code, an oral binder lasts only until a written policy is issued:

(1) A "binder" is used to bind insurance temporarily pending the issuance of the policy. It may be oral or in writing. No binder shall be valid after the agreed date on it beyond the issuance of the policy for which it was given, or beyond such reasonable period as shall be established by rules and regulations promulgated by the Commissioner.[7]

(2) A binder shall include all the usual terms of the policy as to which the binder was given.

P.R.Laws Ann. tit. 26, § 1121 (1976). This comports with settled notions of insurance law. *See* 2 *Couch on Insurance 2d,* § 14:3

(rev. ed. 1984) (in general, "a contract of temporary present insurance is terminated by the issuance, delivery, and acceptance of a policy").

Martinez's dealings with Valle on the point were strictly verbal, and did not purport to extend the coverage to any definite future date. Accordingly, any assurance given in the course thereof lasted at most until written documentation was received by the insured. It is uncontradicted that USF routinely issued written confirmation of any coverage arrangement which Martinez helped to shape within "a month or a month and a half". It is undisputed that on July 19, 1983—almost a full month before calamity struck—USF issued just such an endorsement to Padosa. *See supra* n. 2. That document did not identify Otero as a designated pilot. To the contrary, it reaffirmed the requirement that pilots other than those specifically enumerated (Robles and Pumares) must have had at least 500 hours of flight time in a turbine aircraft. It follows that, even if Martinez neglected initially to clarify the provisional nature of USF's reaction to the proposed inclusion of Otero, *see supra* n. 6, the subsequent written endorsement overrode and supplanted any oral binder that may have preceded it. As Couch explains:

The policy and its indorsements validly made a part thereof together form the contract of insurance, and are to be read together to determine the contract actually intended by the parties. As the indorsement is later in time, it should prevail over any conflicting provision of the policy.

1 *Couch on Insurance 2d,* § 4:36 (rev. ed. 1985) (footnotes omitted).

Thus—without regard to the extent of Martinez's agency (if any)—we do not be-

---

**6.** To be sure, AOA's telex made it clear that any acceptance of Otero was entirely dependent upon his having flown 150 "same make and model" hours as pilot in command, a fact which Padosa had represented to be true. But, there may conceivably be a question as to whether Martinez relayed the proviso to Valle; his deposition seems to us ambiguous in this wise. For the reasons stated in the text, however, we need not dwell upon the effect of any such (possible)

amphiboly. Even if (i) Martinez neglected to mention the condition, and (ii) Padosa is not hoist by its own misrepresentation, there would be no coverage.

**7.** To the date of these events, no rules or regulations supplementary to the provisions of § 1121(1) had been promulgated by the Puerto Rico Commissioner of Insurance.

lieve that, under Puerto Rico law, any oral extension of coverage could have prevailed over the terms of the later written endorsement. Once the latter had been sent, any uncertainty about Otero's status was disspelled. And, when "the terms of a contract are clear ... the literal sense of its stipulations shall be observed." P.R.Laws Ann. tit. 31, § 3471 (1968). "It is not for the court to reform an insurance contract to conform to the parties' negotiations or haphazardly expressed intentions." *Industrial Indemnity Co. v. Aetna Casualty and Surety Co.*, 465 F.2d 934, 938 (9th Cir. 1972). When policy documents are facially complete, reasonably clear, and unambiguously worded, courts have "no basis for rewriting the contract". *Liberty Mutual Ins. Co. v. Gibbs*, 773 F.2d 15, 17 (1st Cir.1985). Accordingly, the insured's expostulation that the pilot clause was stretched, orally, to embrace Otero must fall on deaf ears.[8] Unless Padosa's second "legal excuse" changes the equation, coverage was excluded for the incident in question.

■ 2. *Good Faith.* Padosa asseverates that, even if Exclusion 2 and the pilot clause combine to form a condition precedent to coverage, undiminished by the purported oral binder, appellant nevertheless should be covered because it believed in good faith that the terms of the condition were met, *i.e.,* that Otero had all the necessary qualifications. The argument is ineffectual.

Assuming *arguendo* that Padosa's good faith belief was as stated—a matter about which we cannot be confident on this record—the short answer to its contention is that more than theoretical good faith was demanded of it. Whether or not appellant acted *uberrima fides* in obtaining, conveying, and relying upon palpably false information as to its employee's credentials is altogether irrelevant to the outcome of this suit.

As we have already determined, the pilot clause in this policy comprised a condition precedent to coverage. It was a true exclusion, not a mere representation. *See supra* Part IV–A. That exclusion set forth, clearly and unambiguously, objective criteria which had to be met in order for coverage to attach. Padosa, as the employer of a prospective pilot, was in a far better position than USF to ascertain the truth about an applicant's credentials. Padosa had ample opportunity to vet its prospective pilot's resume, and neglected to do so. The insurer in no way misled the insured or contributed to its mistaken impression of Otero's track record. There is no reason, then, why the parties should not be left to the very arrangement which they crafted. If the stipulations of the pilot clause are unmet, coverage vanishes. "It is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities." *RCI Northeast Services Division v. Boston Edison Co.*, 822 F.2d 199, 205 (1st Cir.1987).

**8.** Because we find that any verbal modification of the pilot clause was effectively subsumed by the July 19 endorsement, we need not explore another sizable cloud which hovers on Padosa's horizons. The Insurance Code of Puerto Rico clearly states:

> No agreement in conflict with, or modifying or extending, any contract of insurance shall be valid unless in writing and made a part of the policy.

P.R.Laws Ann. tit. 26, § 1118(1) (1976). The language of the insurance policy is equally unequivocal:

> ... nor shall the terms of this Policy be waived or changed, except by approved endorsement issued to form part of this Policy, signed by the authorized Company Representative.

As a general rule, courts have displayed great deference to legislation which expressly negates oral contracts of insurance. *See generally* 44 C.J.S. *Insurance* § 250 (listing cases); 43 Am. Jur.2d *Insurance* § 166. In jurisdictions where a statute, like § 1118(1) of Puerto Rico's Insurance Code, requires that any alteration of a policy contract be in writing, such statutes have ordinarily been strictly construed. *See* 13A Appleman & Appleman, *Insurance Law and Practice* § 7601 (1976), citing *Wickes v. State Farm Mutual Auto. Ins. Co.,* 27 Utah 2d 350, 496 P.2d 267, 269 (1972) ("provisions of an insurance policy must be enforced as written, and they cannot be changed or modified in favor of the insured except by a writing signed by the insurer") (footnote omitted). *See generally Industrial Indemnity Co.,* 465 F.2d at 937–38; *Walker v. Coleman,* 367 So.2d 395, 397 (La.App.1978), *cert. denied,* 369 So.2d 1365 (La.1979).

We rule that an insured's good faith belief that it has complied with a policy exclusion like that here in issue, without more, does not serve to override the exclusionary language and to work a retention of coverage contrary to the policy terms and conditions. *Accord Compass Ins. Co. v. Vanguard Ins. Co.*, 649 F.2d at 335–36.

## V. CONCLUSION

It would be fruitless to discuss the district court's denial of appellant's cross motion for summary judgment, and we do not propose to do so. Given the posture of the case, the (deserved) allowance of USF's Rule 56 motion effectively required the denial of Padosa's effort to obtain a resolution of the coverage question in its favor. Similarly, none of appellant's other points merit protracted discussion. We refrain from cataloguing them and observe only that all such contentions have been considered and rejected. In this connection, we echo the Court's teachings,

> ... [A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). As we have already stated, the dispositive legal issue raised in this case was whether Otero met the requirements of the pilot clause. The uncontroverted evidence shows that he did not. The circumstance that Padosa may have erred in good faith as to the flier's shortcomings, even if credited, did not serve to bridge this gap or to palliate its devastating effect. There was no coverage.

We need go no further.[9] Based on the foregoing, we conclude that there was no genuine issue as to any material fact. As a

matter of law, USF was entitled to *brevis* disposition. The judgment below must be *Affirmed.*

assertion that Padosa transgressed the policy's cooperation clause.

---

9. Because the judgment is sustainable on the grounds mentioned in the text, it would be supererogatory to consider appellee's alternative