25 F.3d 1037
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Sylvia Bracero MARTINEZ, ET AL., Plaintiffs, Appellees,
v.
PUERTO RICAN CARS, INC., ET AL., Defendants, Appellees.
UNITED STATES FIDELITY & GUARANTEE CO., Defendant,
Appellant.
 No. 93-1791
 United States Court of Appeals,
First Circuit.
 June 14, 1994
 
 Appeal from the United States District Court for the District of Puerto Rico [Hon. Gilberto Gierbolini, U.S. District Judge ]
 Richard A. Sherman, Rosemary B. Wilder, Law Offices of Richard A. Sherman, P.A., Armando Lasa and Lasa, Escalera & Reichard on brief for appellant.
 Dario Rivera-Carrasquillo, Cordero, Miranda & Pinto, Ramon L. Walker-Merino, Reichard, Calaf & Walker, Marcos Valls-Sanchez and Cobian & Valls on joint brief for appellees.
 D. Puerto Rico
 AFFIRMED.
 Before Selya, Cyr and Boudin, Circuit Judges.
 BOUDIN, Circuit Judge.
 
 
 1
 This case involves a dispute about insurance coverage arising out of a motor vehicle accident in Puerto Rico. The appellant United States Fidelity & Guaranty Company ("USF & G") is an insurance carrier which, along with other carriers, was held liable for a portion of the judgment in favor of the victims. USF & G contends that its policy did not cover the accident at all and, alternatively, disagrees with the apportionment of liability among insurers. On both issues-liability and apportionment-we conclude that the district court reached the right result on the unusual record before it and affirm.
 
 I.
 
 2
 In August 1987, George Fieldman, a resident of New Jersey, went on vacation to Puerto Rico with his family, including his stepdaughter, Theresa Blacketor. Fieldman rented a car from Puerto Rican Cars, Inc., and allowed Blacketor to drive it as well. On August 30, 1987, Blacketor was driving the car with Fieldman in the passenger seat when she collided with a car driven by Luis Cordova Munoz ("Cordova"). Cordova and two of his passengers were seriously injured. Another passenger was killed.
 
 
 3
 In August 1988, Cordova, the injured passengers and representatives of the deceased passenger ("the plaintiffs") filed lawsuits against Blacketor, Fieldman, Puerto Rican Cars, and three insurance companies. The insurers were Farmers' Insurance Exchange ("Farmers"), Blacketor's insurer; CNA Casualty of Puerto Rico ("CNA"), which insured Puerto Rican Cars and had also issued a policy to Fieldman when he rented the car; and USF & G, which had issued a policy to Weiner, Ostrager, Fieldman, and Zucker, the New Jersey law firm in which Fieldman is a partner.
 
 
 4
 After the cases were consolidated, Fieldman filed a claim against USF & G, contending that he was covered under the law firm's automobile insurance policy. USF & G denied coverage, asserting that the policy listed the law firm as the named insured and did not cover Fieldman when he was vacationing in Puerto Rico, was utilizing a rented car, and was not engaged in partnership business. The meaning of the USF & G policy, as written and as allegedly implemented, is the main subject of this appeal.
 
 
 5
 On April 9, 1990, Fieldman moved for summary judgment against USF & G. He was joined by Blacketor, who argued that she too was covered by the USF & G policy because she was driving Fieldman's rented car with his permission. Fieldman included with his motion a statement of uncontested material facts, asserting that USF & G had regularly paid claims under the policy for family members of individual partners in accidents unrelated to partnership business. USF & G did not contest this portion of the statement, but opposed summary judgment on the ground that the insurance policy did not cover the non-business accident in this case.
 
 
 6
 The magistrate judge to whom the case was referred issued his report on June 13, 1990, recommending that summary judgment be entered in favor of Fieldman. He concluded that the USF & G policy was ambiguous and, applying Puerto Rico law, he construed the policy in favor of Fieldman. Alternatively, the magistrate judge said that because of USF & G's prior payment of claims for partners' family members, USF & G was estopped from arguing that coverage was limited to partnership-related activities. The district judge adopted the report on July 5, 1990.
 
 
 7
 Both USF & G and Blacketor filed motions for reconsideration under Fed. R. Civ. P. 59(e). USF & G again argued that the policy did not cover the accident, while Blacketor asked for a ruling that she, like Fieldman, was covered by the USF & G policy. Both requests were denied on February 4, 1991, and the district court entered judgment in favor of Fieldman on February 20, 1991. On May 31, 1991, USF & G filed a motion to modify the judgment under Fed. R. Civ. P. 60(b)(6), relying upon new evidence to explain USF & G's past practice. The magistrate judge recommended a denial of this motion on December 10, 1991, and the district judge concurred on April 1, 1992.
 
 
 8
 In the meantime, the parties reached a global settlement as to most issues. It provided that (1) the plaintiffs would receive a total of $750,000 to be divided among themselves, and (2) the insurance carriers together would contribute that sum and then litigate among themselves to apportion shares. On April 18, 1991, the district judge approved the settlement. The court ordered Farmers and CNA to contribute $300,000 each, and USF & G to contribute $150,000. These payments were provisional. The court reserved final decision on how the $750,000 liability should be shared among the insurers.
 
 
 9
 Finally, on June 17, 1993, the district judge ruled that each insurer should bear a share of the settlement allocated in proportion to its own policy's upper liability limit. This placed the greatest burden on CNA, which had issued two policies, each with a $300,000 limit. USF & G, however, also bore a greater burden than its initial contribution because its policy carried a limit of $500,000; based on the upper limits of the policies, USF & G's policy represented 5/14ths of the total coverage; and its share of the total settlement was 5/14th of $750,000 or $267,857.14. The court's final tally was as follows:
 
 
 10
 Carrier Policy Limit Insured Liability Share
USF & G $500,000 Fieldman $267,857.14
CNA $300,000 Fieldman $160,714.29
CNA $300,000 PR Cars $160,714.29
Farmers $300,000 Blacketor $160,714.29
 ------------
 $1,400,000 $749,999.91
 
 
 11
 The court ordered USF & G to reimburse Fieldman for legal expenses. In addition, the court ruled that Blacketor was also covered under the partnership policy and ordered USF & G to reimburse Farmers for expenses incurred by Farmers in defending Blacketor. A final judgment was entered the same day. This appeal by USF & G followed.[1]
 
 II.
 
 12
 In this court, USF & G's main argument is that its policy did not cover either Fieldman or Blacketor for the accident in question. In substance it contends that the policy clearly excluded coverage, that any past practice suggesting coverage for non-business accidents was adequately explained, and that no estoppel has been made out against USF & G. In this quite unusual case, we think that USF & G has left the record in such a posture that liability could properly be imposed upon it and that its efforts to correct the situation came too late.
 
 
 13
 We start, as is proper in contract cases, with the policy language. The USF & G insurance contract was entitled "Business Auto Policy," and Fieldman's law firm was listed in item 1 as the "named insured," the firm's business address being given as the named insured's address. The policy stated that "you are an insured for any covered auto," and that " 'you' and 'your' mean the person or organization shown as the named insured...." For liability coverage, defined in detail elsewhere in the policy, USF & G promised that it "will pay all sums the insured legally must pay"-up to the policy limit-on accidents involving covered automobiles.
 
 
 14
 Which automobiles were "covered" was the subject of item 2 of the policy, entitled "Schedule of Coverages and Covered Autos." The definition of covered auto depended on the type of insurance coverage. For liability coverage, "covered autos" were said to include "ANY AUTO." Putting items 1 and 2 together with the basic definition of liability coverage, the policy by its terms insured the law firm of Weiner, Ostrager, Fieldman and Zucker against liability for accidents involving any automobile. Nothing else in the lengthy policy casts much light on the issue before us.
 
 
 15
 If the language of the policy were taken in isolation, we would agree with USF & G that the policy would not cover liability incurred by a partner in the course of transportation unrelated to the partnership's business. The reason is that the policy insures the partnership against liability due to automobile accidents. In the normal case the partnership would be liable for automobile accidents growing out of the conduct of its law firm business, but no one suggests that Fieldman's Puerto Rico vacation trip falls into that category or that the partnership bears any liability in this case. See Burnsed v. Florida Farm Bureau Cas. Ins. Co., 549 So. 2d 793 (Fla. App. 5th Dist. 1989).
 
 
 16
 But Fieldman and Blacketor have a second string to their bow. They argue that whatever the bare language of the policy, its actual implementation by USF & G was broader; that USF & G in fact regularly had extended coverage in the past to any family member driving a partner's car with his permission regardless of whether partnership business was being conducted at the time of the accident. This allegation underpins two doctrinally separate arguments. One argument is that the policy, properly interpreted in light of actual performance, has this wider meaning; and the other is that USF & G is estopped to claim otherwise.
 
 
 17
 To show past practice Fieldman's summary judgment filing asserts that when the USF & G policy was issued, Fieldman was given to understand that it covered all the automobiles of the partners; that these included three of his own cars, two of which were used by his wife and himself but never on partnership business; that insurance coverage certificates were furnished for these cars as required by New Jersey law; and that USF & G paid claims without question on accidents, unrelated to partnership business, where his wife was the driver.
 
 
 18
 Remarkably, when USF & G filed its opposition, it did not trouble to address these contentions directly. Rather, it asserted that the policy did not cover non-business accidents, adding cryptically:
 
 
 19
 "In this particular case, the law firm did not hire the vehicle, nor did one of the partners hire the vehicle for the law firm. However, the autos described in the schedule of covered autos are assured under the insurance policy notwithstanding the purpose of the use given to them."
 
 
 20
 The first question that arises in considering Fieldman and Blacketor's "past practice" argument is whether the USF & G policy so clearly excluded coverage that no extrinsic evidence is admissible to construe it. Extrinsic evidence comes in different types and weight, and ambiguities vary both in kind and degree. In truth, the law on questions of ambiguity and extrinsic evidence is clouded in confusion: courts often do not agree with one another and what they assert as doctrine cannot always be squared with what they do in practice. 3 A. Corbin, Contracts Sec. 542A (1960).
 
 
 21
 The precedents in the jurisdictions concerned[2] leave us doubtful whether in the first instance New Jersey or Puerto Rico courts would admit evidence as to how the policy was actually implemented in order to vary the meaning of this seemingly clear policy (estoppel is another matter). The "practical construction" of contract language, as evidenced by the parties' actions, is often said to deserve "great weight," A. Farnsworth, Contracts Sec. 7.13 at 535 (1990). But while the New Jersey and Puerto Rico courts often consider past practice, courts in both jurisdictions have said that insurance policies should be construed according to their language unless they are found to be ambiguous.[3]
 
 
 22
 In all events, we need not definitively resolve the extrinsic-evidence issue because in this case we face a singular circumstance: USF & G has admitted that the policy does not mean what its language seems to say. After reconsideration had been denied by the district court, someone at USF & G apparently woke up and realized that the record did not reflect an adequate explanation of USF & G's past payment of non-business claims under the policy. On May 31, 1991, USF & G filed a motion for relief from judgment under Fed. R. Civ. P. 60(b)(6). This motion for the first time spelled out a possible explanation by USF & G to Fieldman's claim relating to USF & G's past practice. The motion prefaced this answer by saying blandly that previously "the evidence supporting USF & G's position could not be obtained for reasons beyond [USF & G's] control. Finally, it was obtained."
 
 
 23
 The evidence, USF & G's motion asserted, showed that prior claims paid under the policy, to cover accidents by Fieldman family members unrelated to the partnership's business, were paid because the policy covered certain listed automobiles, additional premiums were paid for this coverage, and "[o]nly in these circumstances did USF & G paid (sic) claims not related to the business." Attached were several pages from the policy and some documents relating to family member claims previously submitted to USF & G pertaining to specific cars.[4]
 
 
 24
 The USF & G motion, read generously, may be taken to claim that the insurance policy provided two different categories of liability coverage: first, it covered "any" automobile (owned or rented or borrowed) being used in connection with partnership business; and second, based on an additional premium, the policy covered listed automobiles (apparently owned by individual partners) for all accidents, whether driven by a partner or family member and whether or not the use had any connection with the partnership's business. Based on the information we have today-it still may not be complete-one might guess that the insurer "pancaked" a second layer of coverage on the underlying business policy but did not spell out this coverage in precise language. Thus the policy covered some non-business automobile liability but did not clearly define the limits of that coverage.
 
 
 25
 However one might construe the policy language judged in a vacuum, we think that it would be patently unjust in this unusual case to conclude that the policy language limits liability to business-related accidents where, as here, the insurer has admitted that the policy does cover non-business accidents in some circumstances. If we limit our consideration of actual practice to the statements of Fieldman in his summary judgment motion-statements not unexpectedly very favorable to his interpretation-then past practice resolves the matter in his favor.[5] The question remains whether the Rule 60(b) motion should have been granted, entitling USF & G to the benefit of its description of actual performance and therefore to a trial to resolve the factual conflict.
 
 
 26
 The Rule 60(b) motion was vigorously opposed, Fieldman claiming that it was untimely and denying by affidavit that any additional premiums had been paid. The motion was referred to the magistrate judge who on December 10, 1991, recommended that it be denied: he said that USF & G had had the duty to controvert Fieldman's contentions at the time it answered his summary judgment motion; that USF & G had possessed then the documents now belatedly offered; and that nothing in the Rule 60(b) motion disproved USF & G's payment of claims unrelated to the partnership business. On review, the district court summarily upheld the magistrate judge.
 
 
 27
 The USF & G argument and supporting documents offered in the Rule 60(b) motion might, if timely offered, have required the district court to deny Fieldman's summary judgment motion. One could argue that the policy language does not directly spell out USF & G's theory of coverage and that at the very least an affidavit should have been supplied to show that an extra premium was paid and that the only non-business claims ever paid were for listed automobiles. On the other hand, a cautious district judge would likely have declined to grant summary judgment for Fieldman once USF & G had coherently explained its payment of past non-business claims.
 
 
 28
 But the explanation by USF & G, and the limited support for it, came too late. The time for USF & G to submit its opposition was in April 1990, not in May 1991, long after the summary judgment motion had been granted. Nothing in this record even begins to show due diligence by USF & G, or to explain why it did not offer its rationale and documents at the proper time. Teamsters v. Superline Transp. Co., 953 F.2d 17 (1st Cir. 1992).[6] The notion that after several years of litigation the district court should start over to consider this new submission is without basis. Thus, we need not reach the estoppel claim asserted by Fieldman, a claim whose reliance requirement might prove to be a considerable obstacle for Fieldman (given his own purchase of insurance from CNA when renting the car in question).
 
 
 29
 Blacketor, as well as Fieldman, is entitled to coverage under the USF & G policy for legal expenses. In light of the construction of the policy achieved by Fieldman, Blacketor is covered under the "omnibus clause" of the insurance policy. That clause, with irrelevant exceptions, extends coverage to "[a]ny one ... using with your permission a covered auto you own, hire or borrow". USF & G has not denied that Blacketor was driving the auto with Fieldman's permission. Whether some division of the expenses between USF & G and Farmers should have been ordered has not been argued on this appeal.
 
 
 30
 This outcome may appear at first blush to be a harsh one for USF & G, for it could well have deserved to prevail on the literal language of the policy, had it not admitted that the policy goes beyond business use. At the same time, if given the full benefit of its Rule 60(b) assertions, it might at least be entitled to a remand for a trial on the factual issues posed by the conflict between the Fieldman affidavit and the Rule 60(b) motion. See generally U.S. Fire Ins. Co. v. Producciones Padosa, Inc., 835 F.2d 950, 953 (1st Cir. 1987). It has managed instead to achieve the worst of both worlds.
 
 
 31
 Few tears should be shed for USF & G. Its original assertions could easily have led a court to believe that the policy was limited to business use although USF & G now admits that the policy was not so limited. Its quite different description of the situation occurred only after it had lost before both the magistrate judge and the district court, and even then the explanation is poorly supported. There is no reason why other parties should be forced in these circumstances to face the expense of further litigation to determine whether USF & G's belated explanation is correct.
 
 III.
 
 32
 USF & G contends that even if it is liable under its policy, the insurance coverage should not be apportioned according to the upper coverage limits of each policy. Instead, it argues inter alia that each insurer should pay equally up to the policy limits of that insurer's policy, with the higher-limit insurer making up the balance. On this issue, we follow the parties in treating Puerto Rico law as determinative.[7]
 
 
 33
 Each of the policies, we are told, contains an "other insurance" clause which provides that for this accident the insurer's liability will only be in excess in amounts due under other policies.[8] See generally Hennes Erecting Co. v. National Underwriters Fire Ins. Co., 813 F.2d 1074, 1077 (10th Cir. 1987). This "after you, Alfonse," tactic has not impressed the courts, which often nullify "other insurance" clauses when they conflict. See R. Keeton & A. Widiss, Insurance Law Sec. 3.11(a)(3), at 258-59 (1988). The district court properly refused to take these clauses literally, and the parties do not directly dispute this refusal.
 
 
 34
 The question, then, is how a court in Puerto Rico would apportion liability among carriers where liability is less than the total amount of coverage provided by those policies. The other insurance carriers rely upon the rule, followed in a majority of jurisdictions, that liability should be prorated according to the upper limits of the policies. See, e.g., St. Paul Mercury Ins. Co. v. Underwriters at Lloyds of London, 365 F.2d 659 (10th Cir. 1966); R. Keeton & A. Widiss, supra, Sec. 3.11(a)(3). USF & G offers several theories aimed at reducing its share. The district court followed the majority rule.
 
 
 35
 Interestingly, the USF & G policy (quoted above) itself provides that the majority rule, apportioning liability based on the upper limit of each policy, should be applied where two or more policies cover the accident on the same basis, either excess or primary. If (as represented to us) each of the policies at issue here treats its coverage as excess, then arguably USF & G has contracted for the very apportionment rule applied by the district court in this case. Cf. Aviles v. Burgos, 783 F.2d 270, 282 (1st Cir. 1986) (where the policies adopt the same apportionment rule it governs automatically).
 
 
 36
 The parties have not cited to us any caselaw from Puerto Rico courts that directly governs the apportionment issue. The majority rule has been questioned, see Reliance Ins. Co. v. St Paul Surplus Lines Ins. Co., 753 F.2d 1288 (4th Cir. 1985) (adopting the so-called equal shares rule); and a leading treatise has said that the majority rule is "open to question in a number of contexts." Keeton & Widess, supra, Sec. 3(11)(e). In truth, we have little basis for saying confidently how Puerto Rico would resolve the issue.
 
 
 37
 In the present case, we are not disposed to look beyond the majority rule invoked by the district court. It is still the governing rule in most jurisdictions, and none of the alternatives proposed appears to be without some shortcomings. The majority rule is also the rule stipulated by the USF & G policy for cases where each of the conflicting policies purports to disclaim primary coverage. Absent guidance from the Puerto Rico courts or a more persuasive case for reexamining that rule, we think that Puerto Rico should be assumed to follow the majority rule.
 
 
 38
 Affirmed.
 
 
 
 [1]
 Following the appeal, it appears that CNA advised the district court that its Puerto Rican Cars policy limit was $500,000, rather than the $300,000 assumed by the district court. A motion to adopt amended figures has been filed without opposition but has not yet been granted. The substitution of the asserted new figures-CNA ($375,000), USF & G ($234,375) and Farmers ($140,625)-would not affect the issues presented on this appeal
 
 
 [2]
 We say "jurisdictions" because this appeal has been briefed on the premise that Puerto Rico law governs the interpretation of the USF & G agreement. This assumption is at least doubtful: the policy was made in New Jersey to provide automobile insurance for a New Jersey law firm. There is no indication that Puerto Rico has any connection with either the insurer or the law firm that would lead its courts to apply Puerto Rico law to the policy
 
 
 [3]
 Compare Flint Frozen Foods, Inc. v. Firemen's Ins. Co., 86 A.2d 673, 674 (N.J. 1952) (terms of policy govern) and Velez-Gomez v. SMA Life Assur. Co., 8 F.3d 873 (1st Cir. 1993) (same under Puerto Rico law) with Kearny PBA Local No. 21 v. Town of Kearny, 405 A.2d 393, 400 (N.J. 1979) ("polestar" is intent of parties descended by any means including "the parties' conduct"), and Merle v. West Bend Co., 97 P.R.R. 392, 399 (P.R. 1969) (same)
 
 
 [4]
 The pages from the policy show that certain cars were listed as owned by "the insured" but the policy does not explain that these are actually owned not by the insured (the law firm) but by individual partners. Nor does the policy provide explicitly that these cars are covered for non- business use
 
 
 [5]
 We ignore the possibility that what Fieldman might have been entitled to is a jury trial and not a summary judgment in his favor. When and whether the district court should take a contract issue to be a matter for the judge rather than the jury where the contract is ambiguous but the illuminating extrinsic evidence is undisputed and presents issues of some difficulty. USF & G has not sought reversal on the ground that the issue of policy interpretation on undisputed facts was for the jury rather than the judge, and we will not pursue this possibility further
 
 
 [6]
 The motion, although filed under Rule 60(b)(6), appears more properly based on "excusable neglect" under Rule 60(b)(1), although the neglect here has not been excused. In any event the motion certainly does not demonstrate the "extraordinary circumstances" required for a motion under Rule 60(b)(6). See Gonzalez v. Walgreens Co., 918 F.2d 303, 305 (1st Cir. 1990)
 
 
 [7]
 This issue, unlike the question of USF & G's policy coverage, involves a rule to apportion liability where several different contracts (including two made in Puerto Rico) conflict as applied to an accident occurring in Puerto Rico. Since all parties agree that Puerto Rico law controls, we forego an independent choice of law analysis. See, e.g., Commercial Union Ins. v. Walbrook Ins. Co., 7 F.3d 1047, 1048 n. 1 (1st Cir. 1993)
 
 
 [8]
 The "other insurance" clause of the USF & G policy, the only policy furnished to us on appeal, states:
 
 
 [1]
 For any covered auto you own this policy provides primary insurance. For any covered auto you don't own, the insurance provided by this policy is excess over any other collectible insurance
 
 
 [2]
 When two or more policies cover on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the limit of our policy bears to the total of the limits of all the policies covering on the same basis