USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1054

 DAVID R. GREENLY,

 Plaintiff, Appellant,

 v.

 MARINER MANAGEMENT GROUP, INC., ET AL.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. D. Brock Hornby, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Cyr, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 
 
 
 Michael X. Savasuk on brief for appellant.
 Robert J. Murphy and Holbrook & Murphy on brief for appellees.

September 21, 1999

 
 

 SELYA, Circuit Judge. This appeal arises out of the
sinking of a 65-foot fishing trawler, the F/V MISS PENELOPE, off
the Maine coast. The incident spawned a wrongful death claim on
behalf of a crew member who was lost at sea, a bodily injury claim
by an injured seaman, and a claim by plaintiff-appellant David
Greenly (the owner of the vessel) for property damage. The
defendants, Mariner Management Group, Inc. and Clarendon Insurance
Co. (collectively, "Mariner" or "the insurer"), paid the bulk of
Greenly's claim but withheld $34,370 as a coinsurance penalty
applicable to payments made to settle the seamen's claims under the
protection and indemnity (P&I) provisions of Greenly's policy.
 Asserting admiralty jurisdiction, see 28 U.S.C. 
1333(1), Greenly sued in the federal district court to recover the
withheld amount. The case was heard on cross-motions for summary
judgment. A magistrate judge recommended that judgment enter in
Greenly's favor. Mariner objected. The district court disagreed
with the magistrate's recommendation in relevant part, concluded
that Mariner's position was well-taken, and granted its motion for
brevis disposition. See Greenly v. Mariner Mgmt. Group, Inc., Civ.
No. 98-130-P-H, slip op. (D.Me. Sept. 23, 1998) (unpublished). We
reverse.
 The essential facts are not in dispute. Greenly had
fished the MISS PENELOPE out of Portland for several years prior to
the mishap. Although he captained the vessel throughout that
period, he decided to take an impromptu sabbatical in the fall of
1997. He appointed a member of the crew, Brian Morse, to serve as
captain an action that the policy allowed him to take without
permission from, or notification to, the insurer. Morse's stint as
captain was brief, for the vessel sank in heavy weather just a few
months later. Of the four men aboard when she went down, one was
lost and one was injured.
 Greenly learned of the sinking on January 28, 1998, and
immediately reported it to the insurer. Mariner balked at paying
the wrongful death and bodily injury claims in full when it learned
that four men were aboard the ship at the time of the accident. It
cited the insurance policy's Crew Warranty clause, asserting that
this clause contemplated a maximum of three crew members; and that,
although the insured retained the right to add crew members, he
could only assure full coverage by notifying the insurer before the
fact and paying a premium surcharge, neither of which Greenly had
done. Since the accident occurred with more than three men on
board, Mariner reduced P&I payments in proportion to the ratio
between what it considered to be the stated and actual number of
crew members. It accomplished this reduction by withholding the
calculated amount from the payment due to Greenly under the
policy's first-party coverage on the vessel's hull and machinery.
 Coverage disputes usually depend upon the language of the
policy, and this case is no different. The critical provision is
the Crew Warranty clause, which provides:
 In consideration of the premium
 charged, it is warranted that coverage
 hereunder is provided for not more than three
 (3) crew members aboard the insured vessel at
 any one time. Also, warranted that in the
 event additional crew are to be covered
 hereunder, the Assured shall give prior notice
 to this Company and pay such additional
 premium as is required. If the Assured shall
 fail to give such prior notice and at the time
 of loss with respect to crew there are more
 crew on board, this insurance shall respond
 only in the proportion that the stated number
 of crew bears to the number on board at the
 time of the accident.

 The key to interpreting this clause lies in the meaning
of the word "crew." The protagonists read this word quite
differently. On the one hand, Mariner maintains that the word is
unambiguous and that its common meaning includes the entire
complement of individuals working aboard a vessel in any capacity
(e.g., ordinary seamen, deck hands, the cook, the engineer, the
mate, the captain). On this reading, Mariner urged the district
court to find that Morse (the captain) necessarily comprised part
of the crew, and that, therefore, his presence, together with that
of three ordinary seamen, breached the warranty. Greenly, on the
other hand, maintains that the word "crew" at the very least
excludes the ship's captain. On this reading, he urged the
district court to find that Morse (qua captain) did not comprise a
part of the crew, and that, therefore, the warranty was fulfilled
(i.e., the "crew" on board at the time of the sinking numbered
three).
 The magistrate judge essentially accepted Greenly's
position. On de novo review, the district judge agreed with
Greenly in the first instance; he found that the word "crew," in
and of itself, was ambiguous. But this proved to be a Pyrrhic
victory, for the judge went on to rule that, "[r]ead in its
context, the crew warranty objectively manifests an intent to cover
the captain as well as other members of the ship's crew." The
district judge thereupon rejected the magistrate's recommendation,
denied Greenly's motion for summary judgment, and granted Mariner's
cross-motion.
 We review the district court's entry of summary judgment
de novo. See Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir.
1997); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). 
Like the lower court, we focus on the narrow question of whether
Captain Morse should be deemed a member of the crew for purposes of
the Crew Warranty clause.
 Our first step is to identify the body of law that guides
our interpretative efforts. Although a court sitting in admiralty
jurisdiction must apply federal maritime rules that directly
address the issues at hand, it may and should resort to state
law when no federal rule covers a particular situation. See
Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 320-21
(1955); Acadia Ins. Co. v. McNeil, 116 F.3d 599, 603 (1st Cir.
1997); see also Restatement (Second) of Conflict of Laws 188
(1971). This is such a case. Thus, state law (here, Maine law)
supplies the substantive rules of decision.
 Maine's highest court has observed that the "paramount
principle in the construction of contracts is to give effect to the
intention of the parties as gathered from the language of the
agreement viewed in the light of all the circumstances under which
it was made." Whit Shaw Assocs. v. Wardwell, 494 A.2d 1385, 1387
(Me. 1985) (citation and internal quotation marks omitted). As is
the case with other contracts, unambiguous provisions contained in
insurance policies are to be interpreted as written, giving force
to their plain meaning. See Jack v. Tracy, 722 A.2d 869, 871 (Me.
1999). Nonetheless, some special rules apply to insurance
policies. See, e.g., Foundation for Blood Research v. St. Paul
Marine & Fire Ins. Co., 730 A.2d 175, 180 (Me. 1999) (reaffirming
time-honored tenet that insurance policies are liberally construed
in favor of the insured).
 Ambiguous policy provisions present an area in which this
liberality thrives. Insurance policies are contracts of adhesion,
and amphibolous language is to be construed against the insurer and
in favor of maximizing coverage. See Foundation for Blood
Research, 730 A.2d at 180; Geyerhahn v. United States Fid. & Guar.
Co., 724 A.2d 1258, 1261 (Me. 1999); Johnson v. Allstate Ins. Co.,
687 A.2d 642, 645 (Me. 1997). Of course, an insurance policy is
not considered ambiguous merely because a dispute arises over the
meaning of a particular provision. If, however, an ordinary person
would not understand, with some degree of assurance, that the
provision has a single accepted meaning, ambiguity looms. See
Craig v. Barnes, 710 A.2d 258, 261 (Me. 1998); Peerless Ins. Co. v.
Brennon, 564 A.2d 383, 386 (Me. 1989). Put another way, if the
language used by the insurer is susceptible to two or more
plausible but not functionally synonymous interpretations, then
that language can be found ambiguous. See Allen v. Adage, Inc.,
967 F.2d 695, 700-01 (1st Cir. 1992); Cambridge Mut. Fire Ins. Co.
v. Vallee, 687 A.2d 956, 957 (Me. 1996).
 In this instance, our review of the relevant policy
language leads us to conclude that the Crew Warranty clause
contains an ambiguity as to the captain's status. No less an
authority than the Supreme Court observed some six decades ago that
courts historically have been unable to attach "an absolutely
unvarying legal significance" to the word "crew." South Chicago
Coal & Dock Co. v. Bassett, 309 U.S. 251, 258 (1940). Moreover,
the passage of time has done little to demystify the term. See,
e.g., Tonnesen v. Yonkers Contracting Co., 82 F.3d 30, 33 (2d Cir.
1996). Lexicographers have had no better luck at pinning down a
single meaning for the word. See, e.g., Black's Law Dictionary 334
(5th ed. 1979) ("'Crew' does not have an absolutely unvarying legal
significance or any well-defined factual significance."); Funk and
Wagnalls New Standard Dictionary of the English Language (1934)
(defining "crew" as "[t]he company of seamen belonging to one ship
or boat: sometimes including officers"); Webster's Tenth New
Collegiate Dictionary 274 (10th ed. 1993) (defining "crew" as
"[t]he whole company belonging to a ship sometimes including the
officers and master").
 The demonstrated malleability of the word "crew" renders
the precise meaning of the Crew Warranty clause uncertain. While
it leaves room for the insurer's interpretation that, by
operation of the clause, the insured warrants that the vessel will
be manned by a company of three, counting the captain it makes
equally plausible the insured's interpretation that, by operation
of the clause, the insured warrants that the vessel will be manned
by a company of three, not counting the captain.
 The district court believed that in this instance context
removed the latent uncertainty and gave a singular meaning to the
otherwise ambiguous term. In this vein, the court pointed
principally to the policy's P&I coverage, noting that the owner
would have an additional exposure to liability for maintenance and
cure or for Jones Act damages to a non-owner captain, and that this
fact "would thus be within the parties' contemplation when
contracting for P&I coverage." The gist of the district court's
conception with which we agree is that the insurance company,
from a risk and premium standpoint, probably envisioned that it was
insuring three, not four, persons serving the vessel, and would
have wanted higher premiums for a fourth such person (whether an
ordinary seaman or a non-owner captain).
 There is some further albeit thin support for this view,
urged by the insurer, in the language of the binder that preceded
the policy's issuance. Without going into detail, this language
can be read as juxtaposing the premium to be charged with the
proposition that the coverage is for three crew members, excluding
the captain (because he is an owner). However, the policy itself
did not incorporate that language, and the terms contained in a
binder only regulate coverage until the actual policy issues (at
which time they are supplanted by the terms of the policy). See 1
Couch on Insurance 3d 13:1 (1997); see also United States Fire
Ins. Co. v. Producciones Padosa, Inc., 835 F.2d 950, 956 (1st Cir.
1987). While the fact that the policy supersedes the binder does
not necessarily render the binder irrelevant in construing
ambiguous policy wording, the binder itself is not crystal clear
and the omission of the language to which Mariner points can easily
be taken to mean that the parties rejected the notion.
 Although the question is close, we reject the district
court's analysis. Admittedly, a knowledgeable insurer might
reasonably take the policy as intending to provide coverage for
injury as to three individuals and three individuals only 
aboard the vessel. But a lay person would have no reason to share
this perspective and the fact remains that the term "crew," both
in general usage and in the context of this particular policy, is
patently ambiguous. In parsing insurance policies, Maine courts
must scrutinize policy language "from the perspective of an average
person, untrained in the law or the insurance field, in light of
what a more than casual reading of the policy would reveal to an
ordinarily intelligent insured." Peerless Ins. Co. v. Wood, 685
A.2d 1173, 1174 (Me. 1996). Here, the insured reasonably could
have thought that a non-owner captain was not considered part of
the crew, and that he was fully protected despite the introduction
of a new captain.
 Accordingly, this case is governed by the well-settled
rule that, in doubtful situations involving genuine ambiguities,
policy language is to be construed against the insurer (who drafted
the policy and thus could have avoided the ambiguity) and in favor
of maximizing coverage. See Foundation for Blood Research, 730
A.2d at 180; Geyerhahn, 724 A.2d at 1261; Wood, 685 A.2d at 1174. 
We believe this canon carries decretory significance in the instant
case a case in which a policy term that controls the extent of
the insured's coverage is both ambiguous and reasonably susceptible
to alternative interpretations.
 We need go no further. We conclude that the policy
contains an inherently ambiguous term. Because we find the
insured's interpretation of this term as plausible as the
insurer's, we see no principled basis for departing from the
default rule that requires courts to resolve such ambiguities in
favor of coverage. Consequently, we reverse the judgment of the
district court.

Reversed.